FILED

1    **COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983**

2

3    Name __Polk_____ __Susan_____ M̲

4        (Last)            (First)            (Initial)

5    Prisoner Number __X23159_____

6    Institutional Address _CCWF, P.O. Box 1508, Chowchilla,_

7    __California  93610-1508__

8    ═══════════════════════════════════════════

9                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**

10
     __Susan Mae Polk_____        )    FIRST AMENDED
11   (Enter the full name of plaintiff in this action.)   )    COMPLAINT

12   __Budd Mackenzie__ vs.            )    Case No. _C 08 . 2344 MMC_
                                       )    (To be provided by the clerk of court)
13   _Elizabeth Grossman, Kim Cupferer,_  )
                                          )    **COMPLAINT UNDER THE**
14   _Dan Horowitz, Ivan Golde, Valerie_  )    **CIVIL RIGHTS ACT,**
     _Harris,_                            )    **42 U.S.C §§ 1983**
15   _Barry Morris, Contra Costa County_  )    Request for a Jury Trial
16   _Probation Dept, Shirley Osbourne_   )
     (Enter the full name of the defendant(s) in this action)  )
17                                        )

18   *[All questions on this complaint form must be answered in order for your action to proceed..]*

19   I.    Exhaustion of Administrative Remedies

20        **[Note:** You must exhaust your administrative remedies before your claim can go

21        forward. The court will dismiss any unexhausted claims.]

22        A.    Place of present confinement __CCWF_____

23        B.    Is there a grievance procedure in this institution?    N/A

24              YES ( )    NO ( )

25        C.    Did you present the facts in your complaint for review through the grievance

26              procedure?  N/A

27              YES( )    NO ( )

28        D.    If your answer is YES, list the appeal number and the date and result of the appeal at

COMPLAINT                    - 1 -

each level of review. If you did not pursue a certain level of appeal, explain why.

1. Informal appeal ___There is not a grievance process___
___for Contra Costa County Probation Dept. I did write___
___a letter of complaint and file objection with the cart.___
I did not receive a response. Objections: 6/07 e 9/07. Letter 12/07
2. First formal level_____

_____

_____

3. Second formal level_____

_____

_____

4. Third formal level _____

_____

_____

E. Is the last level to which you appealed the highest level of appeal available to you?

YES ( )      NO ( )

F. If you did not present your claim for review through the grievance procedure, explain

why. _I was not on probation, and to my knowledge, there was no_
_grievance process in place. I did write a letter of complaint_
_to the head of the Probation Dept. He did not respond._

II.    Parties

A.    Write your name and your present address. Do the same for additional plaintiffs, if any.

_Susan Mae Polk , CCWF , P.O. Box 1508 , Chowchilla,_
_CA 93610-1508_____(CDC # X23159)_

_____

B.    Write the full name of each defendant, his or her official position, and his or her place of

employment.

_Barry Morris, 1260 B St., #220, Hayward, Ca 94541-2434; Ivan Golde_
_508 16th St., Oakland, Ca 94619; Dan Horowitz, PO Box 1547, Lafayette, Ca 94549 ;_

1  Liz Grossman & Kim Cuplerer, 1010 Grayson, Berkeley, Ca 94710;

2  Shirley Osbourne, Contra Costa County Probation Dept., 50 Douglas

3  Dr., Ste 200, Martinez, Ca. 94553; Budd Mackenzie, 985 Moraga
   Rd, Ste 214, Lafayette, Ca 94549-4433; Valerie Harris, 3277 View, Mountain

4  III.    Statement of Claim   Vision, CA  94011

5         State here as briefly as possible the facts of your case. Be sure to describe how each

6  defendant is involved and to include dates, when possible. Do not give any legal arguments or cite any

7  cases or statutes. If you have more than one claim, each claim should be set forth in a separate

8  numbered paragraph.

9      1. On 10/14/02, I was arrested and charged with murdering my husband,

10  Budd Mackenzie came to see me soliciting employment as attorney for the

11  estate. He represented my brother-in-law. I learned after my criminal

12  defense attorneys, Liz Grossman and Kim Cuplerer, quit in 2003 after

13  I refused a plea bargain, that Budd Mackenzie negotiated their contract,

14  and that Liz Grossman was reporting to Mr. Mackenzie on a monthly

15  basis. I never provided a conflict of interest waiver. Budd Mackenzie

16  billed me for his services. Liz Grossman walked away with $92,000,

17  of my money, without ever filing a single motion or preparing for a

18  trial. There was never a preliminary. I also learned later that she

19  had been having meetings with Barry Morris, a criminal defense

20  lawyer who had been my husbands patient and "friend," and who

21  actively sought to have me prosecuted. He was a key prosecution witness.

22  IV.    Relief   (see attached statement)

23         Your complaint cannot go forward unless you request specific relief. State briefly exactly what

24  you want the court to do for you. Make no legal arguments; cite no cases or statutes.

25      Compensation for malpractice, defamation of character, fraud, and

26  obstruction of access to legal representation from the parties; the

27  defendants. Additionally, I am seeking the redaction of the

28  Probation Officer's Report & Recommendation for sentencing, and its

COMPLAINT                            - 3 -

1  removal from my CDC file. I do not know what figure to

2  set on the losses I have endured. I am requesting a jury trial.

3  Defendants deprived me of my right to a fair trial and to representation by

   counsel in criminal proceedings against me. +

4  I declare under penalty of perjury that the foregoing is true and correct.

5

6  Signed this  22 nd  day of  March  20 08

7

8  _____ Sean Kee _____

9  (Plaintiff's signature)

10

11  + I also seek the return of court files, clothing and other
    personal property from Mr. Mackenzie.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                              - 4 -

STATEMENT OF FACTS CONTINUED

2. Barry Morris appeared at a bail hearing on 10/1/03. He told the court that he had represented me as an attorney* and that is why I didn't have a criminal record. (Ex A, 10/1/03 tx p. 12: 19-21) I was denied bail. I was represented at the hearing by David Coleman, head of the Public Defender's office.

At another bail hearing on 7/23/04, Morris answered differently.

Q (Jack Funk). "Mr. Morris, did you represent Susan Polk?"

A. (Morris): "In an indirect way, I did."

When Mr. Funk asked if I had waived attorney/client privilege, Morris said:

A: "There was never an attorney/client relationship."
(Ex B, 7/23/04 tx, p. 9: 12-18)

Morris is a criminal defense attorney. The duty to refrain from damaging a criminal defendant's case extends to all members of the bar, except for the District Attorneys.

Morris claimed that I had "hit" my husband in front of police officers to the court, the sheriff's department and the media. He said he had succeeded in having the case dismissed. I have never been charged with any crime before this case, nor did I ever hit my husband.

Morris said I had had a "breakdown." (Ex C, 7/23/04 tx, p. 5: 17-18) My husband concocted the stories that I had had a breakdown and had multiple sclerosis. Both stories were untrue. Morris, I learned during trial, and my husband, were repeating these stories all over town. And Morris continued this campaign after my husband's death. According to Morris, he was my husband's "avenging angel". (Ex D, 7/23/04 tx, p. 39: 15)

My husband came up with a cover story when I asked for a divorce. He was afraid he'd lose his license. I had met him as a 14 year old girl. He had drugged and hypnotized me.

Morris claimed that I had said my husband was a

* He also claimed to have represented my sons and that he was a family friend.

member of the Israeli Secret Service. (Ex BB, p. 8:25-26). I never have said my husband was any sort of agent for any nation.

Morris was not a family friend. He never represented my sons in any sort of bona fide manner. He was my husband's psychotherapy patient. I did all my husband's billing, and I billed Morris for years. It is true that my husband had 'dual' relationships with his clients. My husband's office was also in our home, and Morris' perception that he was a family friend led him to wander out of my husband's waiting room into our kitchen many a time. When I asked him to stop, he became angry and defensive, particularly so, as our kids attended the same school. He wanted a friend for his son, I wanted to have him keep distance.

While I was awaiting trial, Morris frequently appeared to defame me on the media. This behavior has continued after the verdict. On 6/16/06, he went on CNN (Ex E, p.21 par 11).

Morris: "She's crazy. She thought he was after her. She thought he was the Israeli Secret Service."

The only expert testimony presented by mental health experts at trial is that I do not have a mental disorder. As the DA told the jury I was crazy, he commented afterwards: "I kinda got jobbed on that", Judge."

In an MSNBC interview after the trial, juror Lisa Cristwell, forewoman, told Morrison of Dateline: "There is certainly no evidence that she's delusional." (Ex Ee, MSNBC online article, 5/19/07, par. 15, p.11.)

3. When Ms Grossman came on as private counsel shortly after my arrest, I had no idea she was a friend of Barry Morris, and I would never have agreed to be represented by her. Morris' reputation was terrible and his behavior bizarre. Grossman's billing records which I received in 2006 indicate she was meeting with Morris. (Fa & Fb, 11/6/02). She was also meeting with Budd Mackenzie, my brother-in-law's attorney. (Fa, Fb). Ex Fa references the fee agreement prepared by Mackenzie.

4. I didn't know about this arrangement until I

received my files when I went pro per in 2006. That was when Dan Horowitz declared a conflict of interest on or before 1/20/06. (Ex FA). It was four months after I first moved the court to remove Horowitz as counsel based on a perceived conflict of interest. At no time had he informed me that he had worked for Liz Grossman. And I would on my case in 2003 not have agreed to be represented by Horowitz and Ivan Golde (his partner) had I known that Grossman had worked with Horowitz, and that they are friends. (Ex F₂ Grossman's bill) S. Liz Grossman quit on or about 6/22/03, when I refused to plead guilty to manslaughter and to "play crazy". She yelled at me: "So fire me, Susan, fire me".(I didn't.) Afterwards, her co-counsel, Kim Cupferer came to see me, and told me that if I didn't have an attorney with "chutzpah" on my team, I'd get the death penalty. She told me I'd better not try to represent myself, in the same breath, noting I'd done well on the divorce.

6. I was arrested on 10/14/02. The police reports show that Barry Morris went down to the police station in the early hours of 10/15/02 with his stories. * He was seeking custody of my fifteen year old son. Morris claimed that I was "crazy", had hit my husband, that I had threatened to kill my husband and had a gun. None of the above related stories by Morris were true (Nor was it true that we were "family friends".)

7. In fact, my husband had threatened to kill me and had been violent and abusive. He attacked me on the night he died, and he died of a heart attack. According to Dr. Cooper, a pathologist who testified at my trial, my husband would not have died otherwise. (Ex G is Dr. Cooper's letter

* Gabriel

to the court of May 2006, which he verified on the stand. Ex H is Dr Cooper's sworn declaration that none of the wounds (six) he received would have been lethal, absent peritonitis, which would not have set in for days.

8. My husband had punched me in the face, dragged me to the floor by my hair and punched me where I was prone on the floor beneath him. He had a knife in his hand, and I disarmed him with a kick to his groin.

9. At the time of my arrest, I had very faint marks from the punches; bruises were just beginning to form. The photos taken by law enforcement show only a faint shadow, redness and a yellowish color. Over the next few weeks, the bruises deepened into black eyes. My nose became swollen, and my eyes puffy and purplish. County investigators didn't want photos of injuries that looked substantial, and Grossman and Mackenzie didn't take any, though both billed me for representation. (Ex I is Mackenzie's bill) (Ex F is Grossman's bill)

10. I was shocked to receive a bill from Mackenzie's* charging me for "negotiating" Grossman's contract. I never provided a waiver of a conflict of interest. Mackenzie represented my brother-in-law. I didn't hire him. 11. He charged me a total of $6,142.50 for negotiating Grossman's contract and interviewing one of my witnesses, which I did not ask him to do: Jenna Koontz. (Ex II). He also charged me for interviewing Bill Osterhoudt, a defense attorney hired by my parents, and an attorney.

* spring of 2003 or fall

(4)

from the Public Defender's Office, Michael Kotin, and phone calls and meetings with Liz Grossman. He deducted this money from a trust account I'd established to protect my sons. (Michael Kotin was another friend of his)

12. According to jurors, who were interviewed after the verdict, a major reason for their verdict of Murder II was absence of evidence of my injuries. My black eyes didn't show up dramatically in the photos taken the night of my arrest by sheriff's department personell.

(6/16/06, post verdict interview by media, Ex II)*

Juror MacDavid: "I think going back to, ummm, what we had said earlier, we went though (sic) and assessed her markings and that type, and if the things she said had happened, then, like they would have said, there would have been more evidence of that as well."

Unknown (off camera): "You need more evidence of her having more injuries.?"

Juror MacDavid: "That is correct". (P.34:16)

Juror Christwell (fore woman): "The lack of injuries was huge". (P. 34: 18)

I was in custody. My attorney should have had photos taken of my face and my left hand. I had a vivid bite mark on my hand.

12. I have recently received a bill from Mackenzie indicating that he was conferring with Barry Morris. (Ex J, Mackenzie's 2/6/08 bill) On 10/17/02, 10/18/02 and 10/20/02.

*This is a transcript of an interview on CD ROM lodged as evidence from New Trial motion of 2/23/07; App. case no A117633; 1st District.

in 2002

When Mackenzie came to visit me in jail, soliciting appointment as counsel for the estate, I didn't know he was working with Morris. I never hired Mackenzie, and wouldn't have spoken to him if I'd known he was working with Morris.

13. Mackenzie pressed me to resign as trustee of a trust that had been funded with a gift of property from my mother, Helen Bolling (see Ex K, declaration of Helen Bolling) He asked me to agree to have John Polk manage my husband's estate as executer, and my husband's "share" of the trust. As all the property in trust was a gift from my mother, this arrangement was unfair. However, Mackenzie said that if I did not agree, my youngest son, Gabriel, would be placed in the "foster care system." Gabriel was 15. He was in the home of a friend of Mackenzie, Dan Brier. [The property was worth 1.5-1.6 million. It had a $150,000 mortgage. Mackenzie sold it for 1.1 million.]*

14. My middle son, Eli, then 17, was in Byron Boy's Ranch, where he had been sentenced to reside by Judge Kolin when he ran away from his father. Eli was arrested in the spring of 2002 for defending a friend against a bully. My husband, who had trained Contra Costa County Probation, and who had a PO as a client and a DA in Contra Costa County, said he would use the fight to get custody. I had custody. Eli was prosecuted and sentenced to live with his father. When his father was violent, Eli came home. Mackenzie informed me that Judge Kolin is a personal friend of his. (Ex L is a transcript from the

* It was sold without my signature or my mother's in 2003. When I objected, Mackenzie and the Briers threatened to put Gabriel in to "foster care."

9/10/04 bail hearing at which Judge Kolin testified).

Judge Kolin: "That occurred at some later date, but I think, if I'm not mistaken, there was originally a release on electronic monitoring and then the Ranch was later..."

Jack Funk: "There was a period of time where — well, do you have a recollection that there was a period of time where the minor in this case, Eli, had been remanded following what we would refer to as a Jem violation, a violation of the Juvenile electronic monitoring rules?"

A. "Generally, I recall that. Is that the cutting off the bracelet situation?"

Q. "Yes, Yes."

A. "Okay."

Q. "And do you have a recollection that — I realize it's been some time, but there was an issue about the location where the minor in this case, Eli, was residing, whether it be in Alameda County or at the mother's home in Orinda?"

A. yes." (p. 9: 1-19)(Ex L) 9/10/04 hg

Jack Funk: "Do you happen to know a person by the name of Budd McKenzie (sic), an attorney?"

Judge Kolin: "Yes, I do."

Q: "Is he a personal friend?"

A: "Yes, he is."

Q: "Have you discussed this case with him?"

A: "Yes."

Q: "Did you know him prior to the proceedings in April of '02?"

A: "Yes." (p. 13:14-23)(Ex m) 9/10/04 hg.

(7)

15. Mackenzie informed me that there was a possibility of Eli being released early, but that depended upon how "cooperative" I was.

16. I resigned as executor and trustee, securing at least a promise that I would retain control of my assets, ie my share of community property. Upon securing my resignations, Mackenzie and my brother-in-law, John Polk, sold my property for a fraction of its value. I never received any portion of the proceeds. (See Ex K).

17. Attached is a page from Mackenzie's 2/6/08 declaration, requesting "extraordinary" fees from the Probate Judge. He acknowledges speaking to the media about my case. (Ex N. p. 5: 6-9).

His campaign extended to my children, alienating my sons, Adam and Gabriel. For my 2004 bail hearing, Adam (then aged 20) asked the court to release me*. In 2006, he was asking for the death penalty, having swallowed Mackenzie's stories. Mackenzie's bill is laced with hours spent "guiding" Adam and Gabriel.

18. Mackenzie was instrumental in having my bail revoked. (Ex N. p. 5:13-18) He claimed that I stole my own vehicle from Gabriel. Gabriel had borrowed the truck from Eli. Gabriel had two cars. He was not covered by my insurance. He and Mackenzie ignored all requests to either provide the driver's licence number for Gabriel or return the truck.

19. Mackenzie's bill indicates he was in frequent contact with the DA. His 2/6/08 bill reveals on just one random page three calls to DA Tom O'Connor. (Ex O. p29, 10/4/04; 10/28/04). What prompted these calls? I had asked the Briners to return items of personal property they had taken from my home, in addition to asking for the return of the truck. (Ex O. p29) "Telephone conference with John Polk regarding car (Truck) and pension plan. Telephone conference with Adam — call Tom O'Connor... Telephone conference with Tom O'Connor." "2.1 hours."

* Ex PP — Adam's letter to court

(8)

20. The bill also indicates that Mackenzie was in contact with my bail bondsmen. (Ex 0. 9/30/04). My bail bondsmen was seeking payment out of my funds, which were being withheld by John Rilk and Mackenzie. (Ex P. 9/29/04) (p.38)

21. I was represented by the Public Defender because Mackenzie and John Rilk had withheld my assets.

22. On 10/4/05, Mackenzie had a telephone conference with Falguini' - Dateline producer. (Ex Q) On 10/5/05, he had a 4.2 hour meeting with Falguini. I never authorized Mackenzie to speak to the media about my case, and the publicity prejudiced the jury pool.

23. The post verdict interview with the jurors indicates that they were aware of media reports and rumours. The statements to the media by Mackenzie and Morris created a prejudicial climate.

24. Dan Horowitz and Ivan Golde were also making prejudicial comments, reported by the media, both before and after Horowitz' was removed as counsel, with Golde, on 1/20/06. Horowitz violated confidentiality in his opening statement by revealing confidential disclosures, ie that as a minor, I had been arrested for shoplifting. There was no bonafide purpose in disclosing this piece of information, and I had asked him not to. Likewise, that I had made a suicide attempt as a teen, following being molested by my husband, when I was a minor in his care. (Ex R, 10/11/05 transcript: Horowitz' opening statement. p. 32: 3-9) My juvenile record was minuscule and sealed. I had never been in trouble since then. I had a right to confidentiality.

25. Horowitz also made up stories about me. He said to the jury that I was being "incorrigible" at home, "according to (my) mother". (Ex S, 10/11/05 tx.

(9)

p. 25.5) My mother denied making that statement at trial, and she testified that there is no truth to it.

26. A mistrial was declared, and I learned from a TV interview on KTVU that Morris, my husband's self-styled "avenging" angel" was Horowitz' good friend". I did not see the Court TV interview until recently. On 10/18/05, he told Court TV's Catherine Crier: "I mean, you know, Dan's wife was a wonderful person." (Ex. 53, p.3, par. 13) He was introduced as Horowitz' "good friend" by Crier. (P. 2, par. 10). When I asked Horowitz and Goicke to withdraw, Golde said: "This is the biggest case Dan and I have ever had; and we're not going to let it go." Horowitz Dan said we'd say I'm crazy.

27. Valerie Harris was hired by Horowitz as an assistant. She constantly sought media attention, and continued to do so after Horowitz withdrew. I have only recently become aware of the extent of her publicity seeking. I have written to her to ask her to stop, and she has ignored my letters. She and Golde without my knowledge and/or approval gave a copy of the tape of the interrogation of my youngest son, Gabriel to Court TV. They aired it after Horowitz was removed and before my sons testified. I had no idea they had this tape, nor would I have authorized its release. Gabe had been awake since 7am on 10/14/02. The interrogation took place in the wee hours of the morning on 10/15/02. Gabe was dressed only in gym shorts and flip flops. Gabriel and his eldest brother, my son Adam saw the interview on Court TV, as did most of America. And they were enraged at me. It colored their testimony. They assumed I gave the tape to Court TV.

28. On 10/11/05, Horowitz told the jury: "Susan Polk defended her life against an attack by a rageful...man." (Ex U, 10/11/05 tx, p. 18:23-27). He also told the jury that there were five stab wounds, not fifteen (the DA's figure in the first trial). He stated Dr. Wecht, a pathologist he had retained,

Would testify that none of the wounds caused death. My husband died of a heart attack. (Ex v, p55 : 26-28) 10/11/05 tx.

29. On 1/21/06, the day after Horowitz was removed as counsel, Golde told reporters: "I think she's got mental issues." (Ex W), Contra Costa Times, Bruce Gerstman. p. 1, par. 14).

30. Three days before he was removed, Horowitz told Catherine Crier on camera the new spin: (Nancy Grace filling in for Crier) the newscaster

"She has a defence, because if she exploded in the rage of a woman who had been held almost in a cult, the cult of Felix Polk for all those years, having her youth robbed, then that anger exploded in killing her (sic) with all those stab wounds, which is a sign of anger...." (Ex X. 1/17/06, CNN interview. p.5, par. 3)

What prompted this new spin? On or about January 1, 2006, I filed a motion to remove Horowitz as counsel based on a conflict of interest, and to represent myself due to lack of access to my assets and unwillingness to waive time for a new court appointed lawyer to play catch up. My witnesses were elderly. I also did not want to impoverish my sons by pledging equity in my home to my defence. And, for these reasons as well:

31. I said that I was concerned that Horowitz was a suspect in the murder of his wife, and that he had made some incriminating comments to me. (I was also shocked by his revelations and fabrications, and gross misstatements of fact in my first trial.) I was horrified by his attempt to implicate first a neighbor * with whom he was involved in a real estate deal, Mr. Lynch, in his wife's murder, and then a sixteen year old innocent bystander, Scott Dyleski. Horowitz stood to profit from getting Lynch out of the way. And he was envious of Dyleski's talent and wholesome all american good looks.

32. Horowitz was also having an affair with a juror who had been removed from the panel by the DA: a woman much younger than his wife, Valerie Northrup, with whom he had been involved ~~while~~ romantically at the time of the trial. He was obviously infatuated (Horowitz denied the involvement, but married) Northrup on June 2007. Ex Z . wikipedia. online Encyclopedia.)

* Ex Y, p2, par. 11, 10/05 MSNBC Interview

(11)

32. Every pathologist consulted by defense attorneys had attributed cause of death to a hitherto undetected heart condition. The defense in trial was at a disadvantage because the body and internal organs had been cremated. While the prosecutor has an obligation to preserve evidence, so do defense attorneys have an obligation to take steps to ensure that vital evidence is preserved. Neither Mackenzie (who according to his bill was acting as my attorney) or Grossman did so. And no defense attorney had filed a motion to dismiss based on destruction of evidence. I believed that I had to move forward as quickly as possible with the trial to be able to make this point on appeal and seek dismissal.

33. While the DA's office had delayed, and appointed counsel had procrastinated, one of my witnesses had died and my sons, Adam and Gabriel, had become alienated. Meanwhile, Mackenzie, Morris, my brother-in-law, John Polk, and sister-in-law Evelyn Polk, had been smearing Eli, my middle son, who refused to cave into pressure and lie. So, I filed a Faretta motion again, and removed Horowitz. And I was barraged with negative publicity generated by Golde, Morris, and Horowitz.

34. Horowitz' pretext for making media appearances was to defend himself against a charge by me that he had killed his wife. I never said that he killed his wife. I merely reported the facts, as told to me by Horowitz and Golde who seemed elated by their legal maneuvers vis a vis Lynche Dyleski. Horowitz and Golde liked to brag, another reason I had been trying to remove them since about one week after their involvement began in my case. They were particularly proud of Golde's handling of the Chili-finger case against Wendy's, for which Golde was almost prosecuted.

35. I couldn't help but become suspicious

of Horowitz and Golde. At the very least, their morals and ethics were debased. Horowitz told me that he'd bought property adjacent to his own, a five acre parcel, from Lynch at a steep discount, in exchange for giving Lynch a lifelong lease. He then accused Lynch of threatening his wife, and tried to evict him. When Pamela Vitale was killed (Horowitz' wife), in October 2005, he and Golde publicly accused Lynch. Lynch, on TV interviews, looked as dazed as a rabbit caught in the headlights. When the sheriff's department didn't buy Horowitz's story, and their attention refocussed on Horowitz, an anonymous tipster turned in Dyleski. And conveniently, clothing with Vitale's blood was found in an abandoned vehicle somewhere on or near the property on which Dyleski lived with his mother and a family. According to Golde, Dyleski had been befriended by Vitale and was her frequent guest. Hence, his fingerprints on a water glass. Fingerprints do not a murder make, nor do bloody clothes in an abandoned vehicle on a large piece of acreage. When I pointed out these holes in the story being retailed by Horowitz and Golde, and the DA's office and media, Horowitz snapped: he said in an enraged tone of voice:

"I did it. I set this up. And that little Fuck is not getting out of this."

36. I contacted the authorities and Dyleski's defence counsel, as I felt morally compelled to do. And I asked Horowitz to withdraw. He refused, saying he'd tell everyone that I'm crazy. And he did.

37. Nancy Grace, media hostess, rushed to Horowitz' defence. (Ex X . p. 2-3 . pars. 19-3)

      Grace: (to Horowitz) "Hello, Friend."
      Horowitz: "Hi, Nancy."
      Grace: "Response?"
      Horowitz: "It's a very harsh statement ..."
      Grace: "But Daniel, not only is she throwing you off the case — that's one thing — you're number four in a long line of fine trial lawyers ... But to accuse you of murdering Pamela?"

13

38. Horowitz went on to pretend that he was representing me out of his charitable good nature (the same story he had for buying out Lynch). In truth, when he asked for the appointment, I told him I could not afford to retain counsel. Mackenzie and my brother-in-law, John Poltz, had blocked my access to my assets. Horowitz approached me around 8/20/05 with Golde seeking the appointment. I was self-represented. Horowitz said he had a contract with MSNBC. (A producer for MSNBC denied this.) He said he and Golde would cover my story one way or another, and if I didn't agree to be represented by them, I'd have to worry about what they'd say. He said he would take the case for the publicity, and I wouldn't have to pay them. He said he'd present the defense I'd prepared, straight self-defense, not imperfect self defence, retain experts for me, not delay, and that he'd withdraw if I become dissatisfied with his performance. He was appointed on or about 8/23/05. On 9/2/05, he sandbagged me in court with a lien he'd prepared under pen C 987 for reimbursement to the county for the costs of my defence. In terror, I signed a promissory note and the lien, promising to pay out of equity in my house. On 9/3/05, I wrote to Horowitz and told him not to record the lien, and to rescind the promissory note. I asked him to withdraw. He refused. On 9/13/05, and again on 9/20/05 and 9/23/05, I asked the trial Judge, Laurel Lindenbaum Brady to remove Horowitz (and Golde), and she refused. She said I wasn't paying for the defence, the county was, and I didn't have to worry about that. She also said Horowitz was in her opinion, "a good lawyer."

    39. On 1/17/06, he played the benefactor to Nancy Grace on CNN:

    Grace: "Daniel Horowitz... Are you telling me this woman didn't even pay you?"

    Horowitz: "Well, Nancy, we took this case as

a court appointed case, which is about a quarter...."

Grace: "Ok. That's enough."

Horowitz: "And then we're splitting the money too, between me and Ivan Golde."

Grace: "So you and Golde are splitting what, a couple hundred bucks?"
Horowitz: "We're splitting..."
Grace: "That might cover your gas." (P.S. pars. 8-16. Ex **X**)

40. In fact, the county of Contra Costa billed me, and reimbursed itself out of the sale of my home, for $152,352.98 in September of 2007 for Horowitz and his team. (Ex Aa: my summary of expenses billed by Horowitz team and paid by the county. Ex Bb: summary prepared by county for costs billed by Horowitz' team and my experts. Total paid: $222,078.81) The Horowitz trial lasted about four days. None of his experts testified or prepared a report. Not a single witness had been subpoenaed by Horowitz, when his wife's murder ended the trial on 10/15/05.

41. Mackenzie forced the sale of my home on 12/5/07, after promising it would not be sold without my signature, for less than half its fair market value of 2.7 million to 3 million. My husband and I bought the property in 2001 for 1.85 million (1.4 million cash). Mackenzie and my brother-in-law, through their agents, sold it for 1.277 million in december 2007 in a "private sale", wiping out my share of the equity to pay the county for Horowitz and his team, and about $50,000 to my experts. My trial was 3½ months long. I was self represented.

42. This transaction left me without assets to use to post bail on appeal or post as collateral to retain private counsel.

43. Mackenzie took possession of my case files*, and has refused to return them. This follows a pattern of counsel refusing to return files, and contributing to delays in my being prepared.

44. The DA and Grossman collaborated in postponing my preliminary for seven months, from 10/17/02 to June 22, 2003, or thereabouts, claiming that there were "technical difficulties" accessing my diary, which I had written on my computer. Grossman claimed she had not been provided a "bootable copy." In 2004, Jack Funk, court appointed counsel from the Public Defender's office, claimed that the DA's office had still not provided a bootable copy of the hardrive

* photos, and court clothing, as well.

(15)

or the ~~downloaded~~ hardcopy version of the diary in the format that
I had written it in. The portion shown to me by Funk
was missing key sections. The relevance of the diary
is that it contained a day to day account of my life,
including the increasingly erratic behavior of my
husband, his aggression, and threats to kill me and
my children. About one half of the diary was missing.

45. Grossman, Horowitz and Golde refused to
pursue the diary, and move to dismiss the case based
on destruction of evidence.

46. Grossman asked me to "play crazy", saying
that's what my husband's family (represented by
Mackenzie) wanted. In exchange, she said, she'd
worked out a plea bargain for manslaughter.

47. Horowitz' presentation to the jury and
media prior to my asking him to withdraw
undermined my credibility, ie his report that I
had a juvenile record and had attempted suicide.

48. Grossman also made unauthorized statements
to the media. In the Spring of 2003, she told
Carol Pogasch, a writer who published an article
in the NY Times and SF Chronicle, a story making it
sound like I was suffering from some sort of mental
disorder and had snapped and killed my husband.
This was entirely at odds with what I had told her
had happened. I didn't see the story till the year of trial in 2006.

49. Both Grossman and Cuperer acknowledged
that legally, I am innocent. Grossman said that my
husband died of a heart attack. They both said that
I defended myself legally. But, that I'd better go
along with the story, or I'd risk a murder conviction. The
story was that I snapped. That's the story, they

16

said, Mackenzie and the Polk family wanted.

50. Pogasch wrote a book, timed to come out in the fall after my conviction, completely fabricating a story of my life. The version by Pogasch has unauthorized. It's the story concocted by Mackenzie, Grossman and Cupferer. It's Morris' story. It's the story Grossman said that the Polk family wants. It was the story the DA told the jury. It's also Crier's story, in her book published by Pogasch's publishing house. Harper Row. ✱

51. Shirley Osbourne came to see me shortly after the conviction. She said she'd been assigned to write the PO Report for sentencing. It was towards the end of June 2006. I recognized her. She was the PO who wrote the Bail Report in 2003, which was so biased. Jack Funk had large sections erased (stricken) for her reliance on anonymous sources and double hearsay, ie Morris' he-said-she-said stories about what my husband told him. (Ex **Ce**, 7/23/04 transcript, p.28:11+)

Jack Funk: " When you described your concerns to the probation officer preparing a bail study in this case, did you identify to that person your relationship with Doctor Polk as far as him treating your family and giving you professional advice?"

Morris: " Well, that assumes a fact not in evidence, number one."

"And number two, I remember telling the person that did the bail study, basically, the short version of the relationship. I don't remember getting into any great detail. I'm sure I must have told her how I knew Susan. I'm sure she would have asked and I told."

Q: "Did you characterize yourself as a family friend?"

A: " I think that was an accurate characterization. Yes, I did."

Q: "Do you consider yourself to be a friend of Susan's?"

✱ Crier's book: Final Analysis, Pogasch's: Seduced by Madness

52. I told Osbourne that I thought there was a conflict of interest - one of my husband's clients was in the DA's office and he'd trained Prosecutor. I told Osbourne that while I was self-represented at trial, I had asked for counsel to represent me for sentencing and a motion for a new trial. I told her that counsel had not been appointed, and that I'd like to speak to counsel before speaking to her* (This is what I'd told her when she came to interview me for the bail study - that I wanted to talk with counsel first, and she ignored my request.)

53. I was shocked when Osbourne went ahead with the Report for sentencing without interviewing me or any of my witnesses and family members.

54. Her 20+ page report relied on double hearsay, and anonymous sources. Her allegations had not been proven at trial. For example, she said that I had bludgeoned my husband and stabbed him more than 27 times. The DA told the first jury that I'd stabbed my husband fifteen times. Dr. Cooper completely controverted the evidence. As there was no bruising around the scalp laceration, Cooper testified that there was no possible conclusion other than that the scalp injury was sustained from a fall, following a heart attack. Lack of bruising indicates that the heart had stopped before or at the time the injury was sustained. Cooper testified that there were six stab wounds, entirely consistent with my account of self-defense, ie they were random, and not directed toward vital organs.

55. Osbourne quoted an anonymous source, alleging that I had made anti-semitic, anti-law enforcement statements, to whit that I hate jews because my husband was jewish, and that the f-ing nazi pigs broke my arm". My arm was broken on the day I tried to file a Faretta motion, shortly after Grossman quit. I was assaulted and battered by Deputy Cavin, who was supervised by Matt Chetkow, the husband of the trial judge's clerk, Nancy Chetkow (The trial judge was Laurel Lindenbaum Brady.) This incident occurred on 8/29/03, two years before my case was assigned to Judge Lindenbaum Brady's courtroom. I never made these comments. This was the cover story concocted by Cavin and Chetkow.

56. The report has been filed with the Appellate

* In the event that the PD Dept. didn't conflict out.

( 18 )

Court under App. Rule 8.336(g), Cal Rules of Court, where it has undoubtedly prejudiced the panel. Per Cal Rules of Court, 8.336(g), it is filed in a separate envelope under seal, which brings me to my next point:

57. The report was sent to the CDC in lieu of the 'POR' (Probation Officer's Report) referenced throughout Cal Code of Regs (CCR) Title 15, pertaining to the administration of California prisons, defined in sec. 3000 as a report prepared by a probation officer on a CDC form 174. The report filed by Osborne in Superior Court and with the CDC is NOT on CDC form 174; it is a 20+ page word processing document, which does not conform to the requirements in Title 15 and the Dept's operation's manual in form or content. The assertions by the PO are required to be substantiated by verifiable sources.

58. The placement by Osborne of this sealed Court document has prejudiced my appeal and chances for parole, let alone survival at a CDC institution. On 5/5/07, I was told by Sgt Gerber and another CO at VSPW that they "hated" me for the statements attributed to me by Osborne. I was then placed in a cell where I was tortured for four hours by cellmates, who sprayed me with cleaning fluid, including in my eyes, ears, mouth and genitals, punched in the kidneys, culminating in my being hurled against a door jamb, which resulted in my receiving a scalp laceration. CO Pittman laughed, the CO on duty that night while this was going on.

59. In addition to painting me as a bigot and a radical, Osborne claimed without any basis in fact that I'd never worked and I'd been a

'mental patient (my) whole life." I, in fact, worked for twenty years as secretary and treasurer of my husband's corporation. I also managed very profitably family investments throughout that period, while raising three sons.

60. I wrote to the Probation Dept. in 2007, requesting that the report be recalled and redacted. They ignored my letter.

61. When I arrived at VSPW after being sentenced on 2/23/07, staff, relying on the report, characterized me as an 'MDO', though I was not tried as a 'mentally disordered offender,' and there had been no judicial finding that I was an 'MDO'. Nor had I been evaluated as having any sort of mental disorder. According to expert testimony, I do not have a mental disorder.

## APPLICATION OF FEDERAL LAW

1. While other sections of the federal code may apply, I am bringing this tort under 42 USCA s 1983 as an action for deprivation of rights secured by the US constitution and laws.

It is a basic premise of our system of justice in America that a defendant in a criminal case has a right to a fair trial as part of "due process." That right has been found by the highest courts to encompass the rights to representation by counsel, effective assistance of counsel, and to act as one's own counsel in a criminal trial. Counsel who has a conflict of interest cannot provide the effective assistance of counsel to which a criminal defendant is entitled. Amend ⅤⅠ US const.

The defendants Budd Mackenzie, Liz Grossman, Kim Cuplerer, Barry Morris, Dan Horowitz and Ivan Golde acted to deprive this defendant of my right to a fair trial, a speedy trial, and representation by conflict free counsel. They created a climate of prejudice by their unauthorized statements to the media, which tainted the jury pool and the trial itself. Jurors acknowledged being aware of news reports and "rumors". The publicity campaign by Horowitz et al was so extensive, scarcely an adult in the nation was unaware of it.

2. While a defendant in a criminal trial does not have a right to direct her defense unless she is self-represented, she does have a right to an honest defense and to not be misportrayed as "crazy". US const. Amends 4 & 5.

3. In those states which provide a defendant with a right to appeal, as California does, this right is protected by the 14th amend of the US constitution. The case is not complete until the trial is over and the appeal process has been completed. Mackenzie's intentional actions have deprived me of assets with which to sue for my liberty on appeal by obtaining private counsel and/or to use to post bail.

While indigent appellants enjoy a right to appointment of counsel on appeal, it cannot be argued that the appointment of counsel equals retained counsel. And imposing indigency on a defendant on appeal by contriving through fraud, menace and duress to deprive the defendant/appellant of the means with which to sue for her liberty is an attack on the defendant/appellants constitutional right to due process and equal protection

21

under the 14th amend of the US constitution, while at the same time it imposes an unfair financial burden on the taxpayers and the state.

4. While I am not contending that the Probation Department of Contra Costa County and Shirley Osborne defamed me in the same venue as the other defendants in this case, they did defame me in such a manner that they deprived me of rights and privileges secured by the US constitution and its laws.

A PO is given a great deal of latitude in writing a report for sentencing. That latitude does not extend to including rank unverified hearsay and anonymous sources. While the statements were not publicized on CNN, MSNBC and in the newspapers as were the other defendants', the PO's statement has been placed improperly in my C-File, effectually convicting me of crimes I was not tried for. Defendants have a right to confront their accusers and to call witnesses on their behalf. US const. amends VI, VII, as well as to a fair trial.

5. In addition to repeating anonymous stories and tales from Barry Morris, an unreliable source who never testified, the PO reported that I had been charged with 24 counts of contempt of court. Not only had I not been tried, the charges were dismissed. I was deprived of my right to a trial before being labeled as "guilty" by the PO., a violation of US const. amend I.

6. The nature of hearsay is that it is difficult to refute. How does one rebut rumor? How does one undo the damage of an anonymous allegation? For example, the PO's statement that I was a "mental patient" my whole life. When I

Came to prison on 2/27/07, unknowing that the PO Report had come with me, I found myself subjected to inordinate interest from Mental Health staff. I'd been in county Jail four years awaiting trial and sentencing without ever being a participant in mental health programs. I was shocked when a summary case review was prepared by a counselor, who interviewed me for five minutes, characterizing me as an "MDO" (mentally disordered offender). I was not tried as an "MDO", I have never been characterized as an "MDO" before. And there was no judicial determination that I am an "MDO", nor was a finding asked for. That case review, with the PO report, will stay in my file, absent a court order. (I am attacking the characterization in the Case Review in the administrative process available in prison.) My c-file is open to every staff person, and the presence of the PO Report for Sentencing has done extensive damage to my case. I've been taunted by COs as "crazy" and "a mental patient." The report affects my chances of parole negatively, in the event that my appeal is unsuccessful. The report and its offspring, the Initial case summary, make parole unlikely.

PRAYER FOR RELIEF

This tort seeks unspecified financial compensation for defamation of character, obstruction of access to the courts and the right to a fair trial and appeal by the defendants, Mackenzie, Morris, Grossman, Cupferer, Herowitz and Golde, and the Contra Costa County Probation Dept. and Shirley Osborne.

I am also seeking compensation for Osborne's damaging of my chances for parole from the Contra Costa County Probation Department, and the

effect on my custody status. As a direct result of by her defamatory report.

the fabrications in Osbournes report, I have been
brutally beaten in prison, subjected to discriminatory
treatment, and characterized as an 'MDO' on no factual
basis. I seek the return from Mackenzie of my files, evidence and clothing or
compensation. I am also requesting the redaction of the report
and its removal from my CDC file.

I ask that the court fashion whatever other
form of relief it deems appropriate.

TIMLINESS OF ACTION

I was convicted on 6/16/06. Until then, I was
in the custody of the Contra Costa County Sheriffs
Dept. I could not file this action sooner, due to the
following factors:

1. Women in custody in Contra Costa County are not
permitted to attend the Law Library. We must submit
request slips. The Law Librarian refuses to provide
civil materials. (Ex dd).

2. When I arrived in VSPW on 2/27/07, I was
in 'Receiving' until 5/3/07. There is little access to
the Law library, and no meaningful access.* Moreover,
I was deprived of access to my legal materials.

3. I have been 'in and out of Ad Seg for PC
due to violence directed towards me since. Each
time I am placed in Ad Seg, I am deprived of legal
supplies and materials. I have administrative
complaints pending.

4. In Ad Seg, I am also deprived of access to
the Law library sufficient to conduct research.

* There was no access to a civil rights form, nor did I
have any information about this remedy in Receiving.

24

5. Additionally, I was threatened by Horowitz and Kim Cupferer. Kim Cupferer told me to keep my mouth shut, as did Horowitz.

Horowitz also made thinly veiled threatening comments in court and to the media. (Ex.SS, p.3, Court TV, 6/1/06)

Horowitz: "If I did say what really went on during those days with Susan, and if I played the tape recording of the things she said were the reasons for why she was firing me, it would reflect poorly on Susan and make it more likely that she would be convicted... And so I'm going to keep those things private, at least for now."

I'm not aware of any such tape. I have not hidden my reasons for asking Horowitz to withdraw. On 1/20/06, he acknowledged a conflict of interest and withdrew. I didn't fire him.

6. I have filed this tort at the earliest possible opportunity. I have had difficulty getting access to civil law resources in prison. My counselor also ignored my request for a new certification of indigency. I hope the court will accept the one prepared previously (attached), for CVC 1483.

Signed Under Penalty of Perjury, this twenty seventh day of April, 2008.

Susan Polk

25

EXHIBITS: POLK vs. Mackenzie et al

CASE NO _____

A  10/1/03 tx (p.12)                          p. 1
B  7/23/04 tx (p.9)                           p. 1
C  7/23/04 tx (p5)                            p. 1
D  7/23/04 tx (p.39)                          p. 1
Bb  7/23/04 tx (p.8)                          p. 2
E  CNN 6/16/06 Interview                      p. 2
Ee  MSNBC 5/19/07 Interview                   p. 2
F  Grossman's Bill                            pp 2,4
Ef  Faretta – Horowitz conflicts out          p. 3
G  Dr. Coopers 5/7/06 Letter                  p. 3
H  Dr. Cooper's Declaration                   p. 3
I  Mackenzie's 4/1/03 Bill                    p. 4
J  Juror's Post verdict Interview             p. 5
Jj  Mackenzies 2/6/05 Bill                    p. 5
K  Declaration of Helen Bolling               pp 6,8
L  9/10/04 Bail Hg. Tx (p.9)                  pp 6,7
M  9/10/04 Tx (p13)                           p 7
N  Mackenzies 2/6/08 Declaration              p. 8
O  2/6/08 Bill from Mackenzie (p.29)          p.p 8,9
   (10/28/08)
P  Mackenzies 2/6/08 Bill (p.28)              p 9
   (9/29/04)                                  p. 8
PP  Adam Polk's 2004 Letter to Court
    re. Release of Mother on Bail

Q   Mackenzie's 2/6/08 Bill (p. 38)          p. 9
    (10/5/05)

R   10/11/05 tx - Horowitz' Opening          p. 9
    Statement, p. 32

S   10/11/05 tx, p 26                         p. 10

Ss  MSNBC 10/18/05 Interview                  p. 10
    Catherine Crier - Morris

T   6/11/06 Interview Court TV -              p. 10
    Horowitz

U   10/11/05 Trial TX - Horowitz'            p. 10
    Opening Statement (p. 18)

V   10/11/05 Trial TX - Horowitz'            p. 10, 11
    (p. 55)

W   Contra Costa Times - Golde               p. 11
    1/21/06

X   CNN 1/17/06 - Horowitz                   p. 11, 13, 15

Y   MSNBC 10/23/05 - Golde                   p. 11

Z   Wikipedia Online Encyclopedia            p. 11

Aa  Summary of Expenses Paid by Cty.         p. 15

Bb  County's Summary of Expenses             p. 15

Cc  7/23/04 TX - Bail Hg. (p 28)             p. 17

Dd  Law Library Request Slip                 p. 24
    "No Civil"

1

```
 1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2          IN AND FOR THE COUNTY OF CONTRA COSTA

 3          BEFORE THE HONORABLE JOHN C. MINNEY

 4                       Department 12

 5                        --oOo---

 6   PEOPLE OF THE STATE OF CALIFORNIA,  )    ORIGINAL

 7                    Plaintiff,         )

 8      vs.                              )

 9   SUSAN POLK                          )  No. 05-031668-7

10                    Defendant.         )

11   _____  )

12          REPORTER'S TRANSCRIPT OF PROCEEDING

13                   OCTOBER 1, 2003

14               A-P-P-E-A-R-A-N-C-E-S

15

16   FOR THE PEOPLE:          ROBERT J. KOCHLY

17                            District Attorney

18                            Contra Costa County

19                            Martinez,  CA  94553

20                            By: TOM O'CONNOR

21                                 Deputy District Attorney

22

23   FOR THE DEFENDANT:       DAVID COLEMAN,

24                            Public Defender

25                            Contra Costa County

26                            Martinez,  CA  94553

27                            By:  DAVID COLEMAN

28                                 Public Defender
```

12

1          THE CLERK:  Please state your name.

2          THE WITNESS:  Barry, B-a-r-r-y, M-o-r-r-i-s.

3          THE COURT:  Mr. Morris, since I recognize you,

4   I'll state you are an attorney.

5          THE WITNESS:  That's correct.

6          THE COURT:  You've appeared before me.  That's

7   how I recognize you.  That's about all I recall.

8          Go ahead.

9          THE WITNESS:  Okay.  Your Honor, I'm also a

10  defense attorney, and I feel very awkward about appearing

11  here today.  Awkward because it's sort of contrary to my

12  normal appearance in court, but also awkward because the

13  Defendant is someone who, until a few years ago, was a

14  good friend of mine.

15          I have known the Polks for over ten years.  My

16  third youngest son, Joshua, was her youngest son Gabe's

17  best friend.  I represented the boys in various matters,

18  all of them, Adam, Eli, and Gabe.

19          I've also sort of represented Ms. Polk.  The

20  defense attorney noted that she has no criminal record.

21  The only reason she has no criminal record --

22          MR. COLEMAN:  Your Honor, could I interpose an

23  objection?

24          THE COURT:  I'd like to confine myself now,

25  Mr. Morris, to remarks having to do with the things that

26  are raised by you in the probation report.

27          MR. COLEMAN:  And, Your Honor, could I state the

28  basis for my objection?

1

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              IN AND FOR THE COUNTY OF CONTRA COSTA

3          BEFORE THE HONORABLE **MARY ANN O'MALLEY**, JUDGE

4                        DEPARTMENT NO. 4

5                          ---oOo---

6

7     PEOPLE OF THE STATE OF CALIFORNIA, )

8                        Plaintiff,    )

9         vs.                          )     No. 031668-7

10    **SUSAN MAE POLK,**                    )

11                       Defendant.    )

12    _____)

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17

18                       JULY 23, 2004

19

20

21

22

23

24

25

26

27

28

9

1   released, where she cut the -- what do you call -- the

2   electronic monitoring device off Eli's leg.  I've seen the

3   things that she's written about me at various points.  She's

4   delusional.

5          MR. O'CONNOR:  That's all I have, Judge.  Thank you.

6          THE COURT:  Mr. Funk, questions?

7          MR. FUNK:  Stop, stop, stop.

8                 Excuse me just a minute.

9          THE COURT:  Sure.

10                    CROSS-EXAMINATION

11          MR. FUNK:

12     Q.    Mr. Morris, did you represent Susan Polk?

13     A.    In an indirect way, I did.  Do you want to

14   know the details?

15     Q.    Is it your understanding that Ms. Polk waived

16   the attorney/client relationship?

17     A.    There was never an attorney/client

18   relationship.

19     Q.    In what way did you represent her?

20     A.    She assaulted Felix and was arrested.  And

21   Felix called me and asked to get the charges dismissed.  And

22   I spoke -- I never spoke to Susan about the case, but I

23   called someone in the District Attorney's office -- I don't

24   remember who -- about the case.  And passed along Felix's

25   request.

26     Q.    Did you previously testify that you had

27   represented Susan Polk?

28     A.    I don't know if I used those words, but I

5

1  marital difficulties. And Felix and I became friends. We

2  spent a lot of time talking. I spent a lot of time talking

3  to Susan over the years because of shuttling the kids back

4  and forth between the two houses. She's had dinner at my

5  house, I had dinner at her house.

6          Q.   The interaction with yourself and Susan Polk,

7  did anything concern you during those years?

8          A.   Two things. When I was representing Gabe, we

9  had a family meeting regarding what to do about the school

10 situation. And without getting too heavily into the

11 specifics of the situation, I was very surprised because

12 Susan didn't appear to be able to keep on track in terms of

13 the discussion related to the realistic alternatives

14 available to Gabe at the time. She didn't want to have a

15 hearing, but she didn't want him to leave the school. And

16 those weren't the choices that were available.

17          I was surprised and I was told that she had

18 had a breakdown a few years ago.

19          MR. FUNK:   Object to the hearsay.

20          THE COURT:   That is sustained.

21          MR. O'CONNOR:   It is a bail hearing, Judge. I think

22 the Court can look to hearsay to make a decision.

23          THE COURT:   Well, lay a foundation before you come

24 out with an accusation about the breakdown.

25          MR. O'CONNOR:

26          Q.   What information do you have about a

27 breakdown?

28          A.   When I spoke to Felix about Susan's behavior

39

1    your friend was killed as a result of the actions of Susan

2    Polk?

3              MR. O'CONNOR:  Objection, asked and answered.

4              THE COURT:  Sustained.

5              MR. FUNK:

6         Q.    Well, I just wanted to clarify, when you were

7    describing that earlier, it sounded to me as if -- you told

8    us it was a difficult thing to be here.  And it sounded like

9    you were feeling some emotion at that time.  Is that fair?

10        A.    That's correct.

11        Q.    Is it fair to say that you don't come in as a

12   neutral observer of this situation?

13        A.    I don't know what you mean by neutral.  At

14   risk of going into greater length than the question called

15   for, the fact that I am an avenging angel on behalf of Felix.

16   And my feelings are conflicted because both Felix and Susan

17   were friends of mine.

18              And that no one -- to call someone neutral in

19   the context of a homicide involving a friend would be absurd.

20   What I will tell you is that I'm not making anything up.  I

21   will tell you that I've come here to give my best

22   recollection of the events relevant to the questions being

23   asked and that I come here to tell the truth.

24              Other than that, you know, maybe I made

25   mistake.  I don't know.  I've come here with the attitude

26   that I'll tell you what I know.  I told her predecessor in

27   interest I would speak to them.  I spoke to one of your

28   predecessors in interest at great length and answered all

8

1        A.      Yes.

2                I don't like guns and I have never owned a

3   gun.  I don't think that Susan recognizes any normal limits

4   on human conduct.  She's delusional and I think she would

5   think -- might actually believe that she was doing something

6   right in causing harm to me and my family.

7                MR. FUNK:  Objection, speculation.

8                THE COURT:  Sustained.

9                MR. FUNK:  Move to strike.

10               THE COURT:  It is stricken.

11               MR. O'CONNOR:

12               Q.   Do you have a basis why you feel the defendant

13  is delusional?

14               A.   Yes.  I have -- when I spoke to her that time

15  in early 2001, the things that she was saying were

16  delusional.  I mean, in court at the bail hearing, she talked

17  about me having a relationship with her son Gabe through a

18  chat room when she knows full well I've known Gabe since he

19  was six years old or seven years old and she was upset.

20  While Gabe and I exchanged emails, it had to do with stereo

21  equipment or things of that nature.  And she started making

22  strange accusations about that.

23               And I read things that she's written.  I've

24  read -- I don't know if I've read it -- saw it in writing or

25  was told that she's accused her husband as being a member of

26  the Israeli Secret Service.

27               I know about her conduct in her son Eli's

28  juvenile case, both in court, at her house and after Eli was

**.com.** Member Center: Sign In | Register    International Edition

**SEARCH**    ⊙ THE WEB ○ CNN.COM                                  ( Search )

Home Page
World
U.S.
Weather
Business
Sports
Analysis
Politics
Law
Technology
Science & Space
Health
Entertainment
Offbeat
Travel
Education
Special Reports
Video
Autos
I-Reports

# TRANSCRIPTS <u>Transcript Providers</u>

| Shows By Category: |

**Return to Transcripts main page**

## ANDERSON COOPER 360 DEGREES

**New Election Poll Out; Defending the U.S.-Canada Border**

Aired June 16, 2006 - 22:00 ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

ANDERSON COOPER, CNN ANCHOR: Good evening, everyone, from high atop Queen Anne Hill, overlooking beautiful downtown Seattle. Tonight, with the president out here raising money for Republicans, the big question: Has he and have they managed to stop the political bleeding from Iraq? (BEGIN VIDEOCLIP)

Coverage all day and all night

**SUPER TUESDAY
LIVE COVERAGE
ON CNN AND CNN.COM**

A Election Center 2008    popularity, the election may turn on it. We've got new numbers.

So empty it echoes.

**SERVICES**
E-mails
RSS
Podcasts
Mobile
CNN Pipeline

SHERIFF BERNIE GIUSTO, MULTNOMAH COUNTY SHERIFF: We're not here because we're looking good; we're here because we've become the laughingstock of this country.

ANNOUNCER: Millions spent to build a jail. Two years later, it's still not open and criminals are walking the streets. We're keeping them honest.

And they call it the slash.

UNIDENTIFIED MALE: My greatest fear would be having a terrorist slip through our area.

ANNOUNCER: Defending a wild stretch of the longest undefended border in the world the old-fashioned way. This is a special edition of ANDERSON COOPER 360, keeping them honest on the West Coast.

Live from Seattle, here's Anderson Cooper.

(END VIDEO CLIP)

COOPER: And thanks for joining us here. An amazing view of downtown Seattle with the Space Needle. Clear as day. It rained earlier this morning when the president was here. The sun has now come out.

We are wrapping up our West Coast tour tonight, one step behind the president, who is now, after being in Seattle, went on to Albuquerque later on in the day. Like us, he was closing out a pretty good week. Unlike us, there's a report card out already.

New polling numbers tonight, all the angles on that. What appears to be the slimmest boost on job approval for the president, a slightly larger bump on his handling of the war, but a real chiller for Republican candidates this fall. Continuing signs that being associated with this president might actually hurt them.

Also, the war effects. Zarqawi's gone, but the violence goes on. A deadly mosque bombing today. More U.S. troops killed. Is any of it moving public opinion?



COOPER: And welcome back. We are live tonight in Seattle. A guilty verdict today in a murder trial that even by west coast standards has seemed both tragic and warped. Susan Polk was charged with murdering the therapist, a man who later became her husband. She acted as her own attorney. With more, CNN's Ted Rowlands.

(BEGIN VIDEOTAPE)

TED ROWLANDS, CNN CORRESPONDENT: Susan Polk, a 48-year-old suburban housewife who insisted on acting as her own attorney, is now facing at least 15 years in prison after being found guilty for the murder of her husband. Felix Polk, a prominent California psychologist, was killed in October 2002 in this poolside cottage at his home in the San Francisco Bay area. Susan Polk admits she did it but in an interview with CNN last year, she said she acted in self- defense.

SUSAN POLK, CONVICTED OF KILLING HUSBAND: My recollection is that I stabbed him five or six times. I was on my back the entire time. He was aggressing the entire time. He was biting my hand and wrestling for the knife. And I thought I was going to die. So I did -- I mean, it was horrible. But I did what I had to do to survive.

ROWLANDS: It's a story that began in 1972, when Susan Boling then 15, was sent to see 42-year-old psychologist Felix Polk.

POLK: He was my psychotherapist at the time. What I really needed help with was like tutoring and, you know, getting prepared for school.

ROWLANDS: By 17, Polk says she was a willing participant in what had become a sexual affair with Felix Polk, who was married. Then at the age of 25, 10 years after she started therapy, Susan Boling married Felix Polk and together they had three children. Adam, Eli, and Gabriel.

POLK: As I grew older, I was ashamed. I was ashamed that I split up his family. I felt -- I was ashamed that I married my psychologist. When I confronted him about it, he got very, very nervous. And he told me I could never leave him. Because of what I might say. That it would destroy him -- his career.

ROWLANDS: Prosecutors told jurors that Susan Polk attacked and brutally stabbed her 70-year-old husband. The coroner testified that Felix Polk had 27 wounds. Susan Polk claimed she was attacked and simply fought back.

POLK: I was lying there and just for this instant, I thought of myself as that 15-year-old girl. And I thought, no, I'm not going to die here, I'm going to live.

ROWLANDS: Barry Morris, a criminal attorney and friend of the family, thinks Susan Polk was mentally ill when she killed her husband. During the trial, Susan Polk talked about secret government experiments and claimed that she could have prevented 9/11, but her husband stopped her from alerting authorities.

BARRY MORRIS, FORMER NEIGHBOR: She's crazy. She thought he was after her. She thought he was the Israeli Secret Service. Everybody was conspiring against her. She was an oppressed woman.

ROWLANDS: The prosecution's strongest witness, according to jurors, was her son Gabriel who at the age of 15 found his father's body. Both Adam and Gabriel Polk testified against their mother. After the verdict Adam Polk talked about his father.

ADAM POLK, SON: He was not the controlling and manipulative individual that he was portrayed to be. He was an imperfect person, as we all are. But Susan had no right to take him from us. We are glad justice has been served. Because that is what Susan deserves.

ROWLANDS: In the end, jurors said they didn't believe Susan Polk which is exactly what she predicted would happen.

POLK: Am I going to just go down without a fight? No. Do I think I'm going to be convicted? Yeah. But I'm going to give them a fight.

ROWLANDS: Ted Rowlands, CNN, Los Angeles.

(END OF VIDEOTAPE)

COOPER: Joining us now on the phone from Concord, California, is the juror forewoman, Lisa Cristwell. Lisa thanks for being with us. Is that what it boiled down to, you just did not believe Susan Polk?

LISA CRISTWELL, JURY FOREWOMAN: No we did not believe her at all. She claimed to be a battered wife. And we did not see the evidence of that. We saw that she was definitely hit. But it was by her son Eli. Not by her husband.

COOPER: She wanted to know from you and your fellow jurors what she did or said that suggested she should not be believed. What specific instances really made you question her credibility?

CRISTWELL: I think it was not -- saying she was battered. Saying she was punched in the face that evening three times. And she came out of this pretty much unscathed. No injuries to herself at all. And that was pretty damaging evidence for us.

COOPER: How hard were the deliberations? What did you need to convince -- I know you were pretty set early on. Others needed more convincing. What was the big sticking point?

CRISTWELL: I think the sticking point for some, though not the majority, was whether it was a sudden quarrel or not. And most of us believed that it was not. That it was not something that happened as a result of the heat of passion. That it was more intentional than that.

COOPER: And you actually acted out the crime?

CRISTWELL: We did somewhat. You know. Paul Sacora (ph), the D.A., asked is in his closing arguments, charging us to go in there and try it. And we did as best we could. And we did not feel that she could have inflicted those wounds buy being on her back.

COOPER: Did Susan Polk make a mistake by trying to defend herself in court?

CRISTWELL: Yes. Yes, I think she did. I think if she had a competent attorney, she would have done much better.

COOPER: Lisa Cristwell, it's been a difficult process for you I'm sure, appreciate you joining us Lisa, thank you.

CRISTWELL: Thank you.

COOPER: Back to the northwest where security prevented one terrorist attack but more needs to be done. We'll show you why patrols on horseback are playing a central role right now in strengthening security efforts along the Canadian border.

Plus citizen volunteers on the border. They are so trusted that authorities here actually train them to use deadly force. Those stories and more on this special edition of 360 Live from Seattle continues.

(COMMERCIAL BREAK)

COOPER: Welcome back. We are live tonight from Seattle. We are close to the Canadian border tonight. Not far from here in Seattle, just north of here in Port Angeles is where the would-be millennium bomber tried to enter the U.S. And if you move east across Washington to Idaho, to Montana, there's a vast amount of rugged terrain that's potentially vulnerable. Tonight CNN's Randi Kaye reports on the border patrol's newest old weapon.

(BEGIN VIDEOTAPE)

RANDI KAYE, CNN CORRESPONDENT: They call it the slash. The dividing line between Washington State and Canada. It slices right through some of the most beautiful but rugged mountains in the country. The kind of terrain that affords safe passage for smugglers, immigrants, and terrorists. GARY ROMAN, U.S. BORDER PATROL: My greatest fear? Would be having a terrorist slip through our area.

KAYE: Border agent Gary Roman knows the Canadian border is the largest undefended border in the world. Just 1,000 agents monitor more than 4,000 miles. Islamic terrorist Ahmed Ressam slipped through in 1999. From Canada to Washington. He was looking to blow up Los Angeles International Airport. The only terrorist caught crossing the U.S. border with explosives. And in 2003, two Pakistani men smuggled in from Canada were arrested at Seattle's airport. One was on a no fly list.

CARL ECKLUND, U.S. BORDER PATROL: The border up here kind of scares me. Because it's just so -- there's just so much of it. There's so much territory to cover. That it would be nice to have some more help.

KAYE: Border patrol in the enormous Spokane sector have no experience with terrorists but they see a lot of smugglers. Just this week they caught two men with large quantities of cocaine. Last weekend, they caught 13 illegal immigrants.

ECKLUND: The trees are so dense, you know. They don't think we're out here. So they think their odds are better trying to get through a place that's as remote as this.

KAYE: But two months ago the Spokane border patrol changed those odds. They went back to the future. Not even flying drones or high- tech motion sensors could do it better. The Spokane sector of the border patrol and their horses are responsible for more than 300 miles of border that spreads across three states. Washington, Idaho, and Montana. Now, that's more than 87,500 square miles of territory. And much of it is impassable.

ECKLUND: Most of it's steep mountain terrain. That makes it impossible for a vehicle to climb. Heavy vegetation, such as we're in now, which makes it difficult and unpleasant if you're on foot.

 **MSNBC.com**                                                                                      

# Susan Polk case: murder or self-defense?

A murder trial that grew more bizarre with every turn
By Keith Morrison
Correspondent
updated 8:27 p.m. ET, Sat., May. 19, 2007
A report on the Susan Polk case aired on Dateline on July 2006. A follow-up updated report was broadcast on May 19,
2007.

OAKLAND HILLS, Calif. - Her name is Susan Polk. She is, within the curious celebrity world of the famously accused,
among the most articulate, elegant.

But more than a few people wondered, when she sat awaiting trial—is she really delusional?  A little off?  Or the perfectly
sane victim of the whole sad business?

As for killing her husband, however, everybody agreed from the start... *that* happened.

**Susan Polk:** I thought, "Oh my God, he's dead, I've killed him, I've got his blood on my hands, how am I gonna
tell my children what happened? They will never see me the same again."

His name was Felix Polk. Perhaps even more articulate, more cultured than his wife until he met his fate on October 13,
2002.

**Barry Morris:** If you had told me five years ago that I'd be sitting here, and Susan would be in jail and Felix
would be dead, I wouldn't have believed it.

By now, Barry Morris is more than just a former neighbor of the Polks. If Felix Polk can be said to speak from beyond the
grave, it is through his old friend Barry.

**Keith Morrison, Dateline correspondent:** What kind of a man was he?**Morris:** Very urbane, worldly. He liked
classical music and very bright, good sense of humor.

Felix Polk was apparently kind and an accomplished psychologist, therapist and a counselor. Why would his own wife, the
mother of his three children, kill him?

The answer's not so simple of course, it never is. But it lies somewhere here in the shadows of these bucolic hills just
east of the San Francisco bay. Behind the facade of a privileged, seemingly perfect life is the disturbing tale of a
dysfunctional family with dark and ultimately violent secrets.

That one of them is dead, we know. But still the question: Exactly what happened here... and why?

#### Seeds were planted long ago
Back in the 1970s, a young Susan Polk, then Susan Bolling, was growing up in suburbs of Oakland, California. Her
parents were divorcing, and her mother Helen said Susan found comfort in books.

**Morrison:** As she grew up did she read a lot?**Helen Bolling, Susan Polk's mother:** Oh man, she said that books
were her friends.  By the time she was fourteen she'd read Turgenev, Chekhov, Tolstoy— you name it.**Morrison:**
Gave herself a classical education?**Bolling:** Yes, yes.

But where it came to Susan's assigned school work, it was a different matter. Her teachers worried.  She was troubled
somehow.

Helen wondered if Susan was trying to shut out the emotional turmoil of her parents divorce. She had no idea, of course,
that the question would come back to haunt her in time.

As time progressed,  Susan  matured into a beautiful young woman. She graduated college, and at 25, got married to
Frank Felix Polk. It seemed an odd pairing: He was double her age, a Holocaust survivor from an affluent Austrian family

Case 3:08-cv-02344-MMC    Document 3    Filed 05/13/2008    Page 43 of 43
Susan Polk case: murder or self-defense? - Dateline NBC - MSNBC.com
Page 11 of 12

*Catherine Crier: What should happen to her? Gabe? Gabriel Polk: Tough question. Ideally she should get some sort of help. So the outcome either becomes jail or out on the street and between the two, I choose jail.*

Eli, for his part, was silent, unable to voice support for Susan, but for a completely different reason. Eli was sitting helpless— in the very same jail as his mother— for a recent unrelated assault conviction, the latest of a string of troubles for Eli.

Meanwhile, days ticked by, and the prosecutor began to suspect he had a hung jury on his hands.

**Sequeira:** But as we approached Friday, I started to be getting a little nervous that there was some disagreement which I think there was probably.

And then finally, the fourth day of deliberations, a Friday morning, the jury had reached a verdict. Susan was brought into the courtroom and very much alone.

**Pogash:** There was no family there for her. Her sons, Adam and Gabe were there in the front row. But, they weren't there to support her, they were there to see her convicted of murder. Susan's mother and brother left before the verdict. She really wanted them there. She begged them to stay. But, they left.

The clerk read the verdict: First degree murder—not guilty.

**Sequeira:** And I heard it and my heart kinda jumped a little bit. And I said, "Oh my God." **Pogash:** And it sort of took everyone's breath away. Because it's like saying that she's not guilty? And, Susan Polk wasn't sure either.

And then the clerk continued. Second degree murder: guilty.

The jury was not convinced the killing was premeditated, but they didn't buy her claim of self-defense either.

Susan turned to her trial assistant and said, "My life is over."

**Juror:** I don't think Susan Polk is a violent vicious person, but she murdered her husband. She's got to pay the price for it.

But was she delusional? Was she, as her eldest son called her, "cuckoo for Cocoa Puffs"?

**Lisa:** She had been telling us for three and a half months that she is not delusional. And there is certainly no evidence that she's delusional.

Earlier this year, Susan Polk was sentenced to serve 16 years to life in prison. Her effort to defend herself failed so spectacularly. She's filed a notice of appeal.

Adam and Gabriel are working to rehabilitate their father's memory. They filed and settled a wrongful death lawsuit against Susan, though she never admitted liability.

Eli, her troubled champion is now freed from jail and said his life is empty without his mother.

During our interview with Susan last year, the final question was for all her boys. But she was thinking, just that moment, about her baby, her accuser, her Gabriel.

**Susan Polk:** It's my job as a mother and my duty to love him forever. As long as I'm alive, I will love him. And there's other kinds of closeness. (crying) You know, there's an emotional closeness and I think there's a mental closeness. I'll never desert him.

*© 2007 MSNBC Interactive*

URL: http://www.msnbc.msn.com/id/14095385/page/2/



GROSSMAN

Attorney Time Sheet (Polk): 10/25/02 – 11/27/02

| Date | Action | Time |
|------|--------|------|
| 10/25/02 | Telephone calls with Adam Polk & Dick Bolling re: D and retaining EG | 0.75 |
| 10/26/02 | Meeting with D at jail; travel to and from | 3.0 |
| 10/28/02 | Telephone call to Adam re: status | 0.25 |
| 11/3/02 | Telephone calls with Breiner, Bolling and MacKenzie re: retainer | 0.75 |
| 11/4/02 | Telephone calls with MacKenzie & Breiner | 0.50 |
| 11/5/02 | Meeting with D at jail; confirmed representation; travel to and from | 2.0 |
| 11/6/02 | Court Appearance: Arraignment; discussion with DA, Barry Morris, Judge, PD and D re: representation; next date 11/15/02; travel to and from | 2.0 |
| 11/7/02 | Telephone call with MacKenzie requesting funds for psych, which he would not approve<br>Prepare draft fee agreement and fax to MacKenzie<br>Telephone consultation with Walch | 0.25<br><br>0.50<br>0.25 |
| 11/8/02 | Telephone consultation with Walch | 0.25 |
| 11/10/02 | Review changes to fee agreement<br>Meeting at MacKenzie's office with Breiner and Adam re: retention; travel to and from | 0.25<br>2.5 |
| 11/11/02 | Redraft fee agreement and fax to MacKenzie; telephone calls with MacKenzie re: transporting document to jail for signature<br>Telephone call with MacKenzie; D d/n want atty. | 1.0<br>0.0625 |
| 11/13/02 | Telephone call to MacKenzie re: jail meeting<br>Telephone call from MacKenzie re: D signed agreement | 0.0625<br>0.0625 |
| 11/14/02 | Telephone call to MacKenzie re: arrangements for signature of agreement and retainer | 0.0625 |
| 11/15/02 | Meeting with MacKenzie @ his office for signing of agreement; received retainer check; discussed strategy; court appearance: arraignment, entry of plea (next 12/20/02 9:00 a.m.)<br>Telephone call with Gore re: investigation<br>Reviewed materials re: 187 defense<br>Review of voluntary vs. involuntary & BWS application to same | 2.0<br><br><br>0.50<br>1.0<br>1.0 |



GROSSMAN
Paralegal Time Sheet (Polk): 6/1/03-6/30/03

| Date | Action | Time |
|---|---|---|
| 6/4/03 | Review documents in boxes | 4.0 |
| 6/5/03 | Review documents in boxes | 2.0 |
| 6/9/03 | Review computer discovery file material; Telephone call with Horowitz re computer files | 0.25 |
| 6/12/03 | File organization | 0.5 |
| 6/13/03 | Transport discovery for scanning; | 0.375 |
| 6/16/03 | Meeting with KK re: discovery on CD | 0.25 |
| 6/17/03 | Letter to crime lab re: photos<br>Discuss discovery with KK<br>Meeting with KK and EG | 0.25<br>0.25<br>0.5 |
| 6/18/03 | Letter to crime lab re: photos | 0.25 |
| 6/19/03 | Boxed records organization<br>Prep of consent documents; software installation | 1.0<br>0.5 |
| 6/25/03 | Discovery organization | 0.5 |
| 6/26/03 | Purchase external hard drive | 0.5 |
| 6/30/03 | Deliver external hard drive and discovery letter to DA | 1.5 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Total Hours | 12.125 |
| | Total Fees (12.125 Hrs. @ $50/hr.) | $606.25 |



## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF CONTRA COSTA

DATE: 1-20-06                    DEPT.: 31
JUDGE: LAUREL S. BRADY          COURT CLERK: N. Chertkow
SHERIFF: Warren E. Rupf         REPORTER: D. Eastridge, 9260
--------------------------------------------------------------
PEOPLE OF THE STATE OF          PRESENT:
 CALIFORNIA
                                Dep. D.A.: T. O'Connor
vs.

SUSAN MAE POLK,                 Def. Atty: D. Horowitz
Defendant                       Def. Atty: I. Golde
                                Investigator: V. Harris

--------------------------------------------------------------
NATURE OF PROCEEDINGS:          Action No.: 031668-7

### FARETTA MOTION

The defendant and counsel are present in open court.

The Court received notice from Mr. Horowitz after the last
hearing that he has a conflict with representing the defendant.
The Court ask Mr. Horowitz to state his conflict for the record.

The Court relieves Mr. Horowitz, Mr. Golde and any other person
working for them as counsel of record.  The Court orders Mr.
Horowitz and Mr. Golde to turn over all discovery and documents
to the defendant by January 23, 2006 by close of business day.

The Court will notify the jail that Mr. Horowitz will be bring
documents to the defendant.

The defendant request that Ms. Harris remain on her case.  The
Court will defer that decision to the Presiding Judge.

May 7, 2006

Honorable Judge Laurel Brady
California Superior Court, Contra Costa County
A.F. Bray Building, Department 31
1020 Ward Street
Martinez, California 94553

Dear Judge Brady:

In view of the hostile behavior of the prosecuting attorney following my testimony on Thursday, culminating in his refusal to proceed with cross-examination, I am hereby withdrawing from any further participation in People v. Polk.

It is regrettable that I was unable to completely fulfill my designated role in the case during the week I had set aside for it. It was my privilege to appear in your courtroom, and none of what follows is in any way intended to reflect unfavorably upon the Court. I hold Mr. Sequeira completely responsible for last week's debacle. Perhaps he has forgotten that justice isn't always about winning.

Allow me please to review the facts as I see them: Susan Polk is on trial for murder, because Dr. Brian Peterson, a county contractor, saw fit to present a distortion of the autopsy evidence to the Coroner, to the District Attorney's office, to the Grand Jury, and ultimately to the trier of fact in a murder trial. Not only has Mrs. Polk been indicted on false pretenses, but she has also suffered from protracted false imprisonment and estrangement from her sons as a result of Dr. Peterson's false representations.

My purpose last week was to provide a thorough exposition of the physical evidence, in sufficient detail and clarity that everyone....including the jury, the Court, the prosecuting attorney, the media and ultimately the public.... would not merely find a reasonable doubt as to the charges, but would actually see that the evidence fully exonerates Mrs. Polk. Moreover I wanted everyone to see this for themselves, rather than asking them to rely upon the opinion of one expert witness versus that of another. I have no doubt that I succeeded in this. However, normal procedure would have afforded me opportunity to further solidify my testimony by responding to cross-examination questions about the evidence, and would have allowed Mr. Sequeira an opportunity to try to create doubts about the testimony, if he chose to do so. He chose not to; instead, he created a dramatic smokescreen about some discovery issues that have no bearing on the physical evidence, and certainly have nothing whatsoever to do with the fact that an innocent woman is being held on false charges.

Mr. Sequeira is in an untenable situation, so I understand why he would want to postpone dealing with the evidence. He must either take the unconscionable path of pursuing a conviction, or the politically impossible path of dropping the charges and, in effect, admitting to the taxpayers that it was all a big mistake. I don't expect him to do either; I expect him to opt for the more astute strategy of provoking a mistrial, one which can be

blamed on a defense expert and will not reflect adversely on the Court or the District Attorney's office. Thus the innocent defendant goes free, while the county saves face. This is what I believe Mr. Sequeira is leading up to. Whether this is proper or not, it is certainly clever, and potentially may serve the cause of justice.

Given the corner Mr. Sequeira has been backed me into I have no choice but to withdraw from the case. Here are my reasons:

1) I set aside one week for this trial, and I have other obligations that will not allow me to return to Martinez before the trial wraps up. The nature of the evidence is not responsible for the delay; neither, certainly, are Susan Polk or myself. The Court decided not to allow postponement of testimony of a local, captive witness in consideration of two out-of-state witnesses, and the prosecuting attorney elected to launch into histrionics over irrelevant discovery issues, rather than getting on with his cross-examination. I have made myself very adequately available to this trial, in good faith, but legally binding obligations elsewhere will now not allow me to make myself further available than I already have.

2) Mr. Sequeira has placed me in an impossible situation by goading the Court into ordering me to perform a feat I had already declared myself – under oath - unable to perform, and without giving me any further opportunity to protest. This forces me to choose to either fail to comply with a court directive, or to make compliance moot by removing myself from the case.

3) Knowing the difficulties of an in-demand expert witness making himself available for a trial halfway across the country, Mr. Sequeira is attempting to circumvent fairness in these proceedings by delaying cross-examination of a key witness sufficiently long enough to make further participation not feasible. The issue he has concocted to disguise this tactic is altogether phony. In the first place, the contention that I relied upon anyone's statement in arriving at my opinions is completely out of line, as none of the opinions to which I testified had anything whatsoever to do with whether or not Susan Polk's version of the events was truthful. Indeed, I was expressly forbidden to express any such opinions. My statement that her version of the events was fully consistent with the autopsy evidence was a statement of fact, not opinion. Were this not so, you would have ordered it stricken from the record. Moreover whatever discovery materials Mr. Sequeira desired were a matter for the pre-trial period, and it was highly improper for him to decline to ask for anything and then attempt to portray me as a secretive, uncooperative witness for not providing it. My concerns that Mr. Sequeira would have resorted to dirty tricks to prevent me from testifying, had he known how decisively exculpatory my testimony would be, were evidently very well founded. Nor am I under any legal obligation to bring anything whatsoever to court if nothing has been subpoenaed or at least requested, particularly when everything upon which I relied in reaching my opinions, or about which I intend to testify, is already on exhibit. I have never brought anything with me to the witness stand, and this has never been questioned. Mr. Sequeira's contrivance constitutes obstruction of justice. His insistence on irrelevant, non-discoverable and previously unrequested materials, going to the extreme of demanding that the

Court send me across the country to retrieve said materials, under threat that he will not proceed with cross-examination otherwise, constitutes an unwarranted delay in the proceedings and an abuse of criminal procedure. All of this is obviously designed to deprive the defendant of the benefit of a key expert witness. Mr. Sequeira's machinations are improper and underhanded, and it causes me great concern to see that they have been tolerated to such an extent by the Court.

4) Finally, I am outraged by Dr. Peterson's irresponsible, unprofessional and, to my way of thinking, immoral conduct. For your information, I also have detailed knowledge of cases in which Dr. Peterson or members of his group have participated in covering up gross medical or nursing care negligence, wrongful death and, in one instance, even homicide. I refrained from discussing his connection with these incidents on the stand, because I wanted to maintain the focus on the evidence in the Polk case. The evidence of deceitful presentation of evidence by Dr. Peterson in this present case is conclusive, and I am profoundly disturbed about it. I consider this man to be nothing less than a public menace. Combining this highly charged issue with having a defendant without proper counsel, I find myself feeling and acting more like an advocate than an impassive witness. Mr. Sequeira's exceptionally belligerent manner really brought this out. Since I believe that any hint of advocacy or emotionality on my part could adversely impact upon Mrs. Polk's defense, I believe I ought to withdraw, even if it were only on these grounds alone.

In summary, I have compelling reasons for resigning from this process. I signed on to help all parties concerned arrive at a just conclusion to these proceedings, and I believe I have done my best in this regard. However now that Mr. Sequeira has contrived to make my record-keeping the central issue instead of continuing to prosecute the case based on the facts in evidence, my continued participation can only be an impediment to the cause of justice...and this is morally unacceptable to me. Moreover his stalling tactics have caused me to run out of time to participate in this trial.

I will not be answering my phone this week, since I intend to make myself inaccessible to the media until this matter is resolved, and also I must travel, but any message left on my answering machine by your office will receive the most prompt attention possible. If you still want the file, then of course I will send it, but I cannot imagine it will be of much use if I am not available to testify as to its contents.

Respectfully yours,

John T. Cooper, M.D.

B4

1   Susan Mac Polk
    2005008816
2   8A-33 WCDF
    5555 Giant Highway
3   Richmond, CA  94806

4

5

6

7

8             SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                       COUNTY OF CONTRA COSTA

10  PEOPLE OF THE STATE
    OF CALIFORNIA,
11                                      No. 05-031688-7

12
              Plaintiff,               DECLARATION OF
13                                     DR. JOHN T. COOPER, MD

14  SUSAN POLK,

15            Defendant.

16

17           DECLARATION OF DR. JOHN T. COOPER, MD

18  Review of the transcript of my testimony under oath will confirm that your notes are correct:  the

19  stomach wound would be expected to lead to peritonitis over the course of several hours, which could

20  potentially eventuate in death in several days, if untreated.  Since we have a record of this sworn

21  testimony, I see no need for a separate sworn statement, nevertheless I am making this statement via

22  e-mail under penalty of perjury.

23

24
    Dated: Monday, June 12, 2006
25

26  John Cooper, M.D, Forensic Pathologist

27

28

EX #  I

***Budd E. MacKenzie***
*A Professional Corporation*

COPY

April 1, 2003

Susan Polk

## PROFESSIONAL FEES THROUGH APRIL 1, 2003

| | | |
|---|---|---|
| 10/29/02 | Telephone conference with Montana real estate agent regarding earnest deposit – Correspondence to broker – Telephone conference with Elizabeth Grossman. | .80 |
| 11/01/02 | Call Bill Osterhoudlt – Telephone conference with Mike Kotin. | .60 |
| 11/05/02 | Telephone conference with Montana Title Company – Review attorney fee contract for Susan's defense attorney – Telephone conference with Bill Osterhaud – Prepare for meeting with Susan Polk – Prepare schedule of liabilities – Meet with Susan Polk –Deposit funds to Adam's account. | 3.50 |
| 11/06/02 | Telephone conference with Elizabeth Grossman – Telephone conference with Adam regarding Susan's representation – Review Fee Agreement – Prepare Letter to Elizabeth Grossman to modify contract. | 3.70 |
| 11/08/02 | Finalize letter to attorney Elizabeth Grossman – Finalize revision of proposed fee agreement. | .80 |
| 11/10/02 | Prepare for and attend meeting with Elizabeth Grossman and Adam. | 2.00 |
| 11/11/02 | Review Revised Fee Agreement for Liz Grossman – Call Liz Grossman – Prepare letter to Liz Grossman – Meet with Adam regarding Susan's legal representation by Liz Grossman. | .80 |
| 11/12/02 | Meet with Susan Polk regarding Fee Agreement with Liz Grossman. | 1.50 |

*985 Moraga Road, Suite #214*
*Lafayette, California 94549-4433*

**_Budd E. MacKenzie_**
*A Professional Corporation*

| | | |
|---|---|---|
| 11/13/02 | Call Liz Grossman. | .30 |
| 11/14/02 | Call from and to Liz Grossman – Correspondence to Liz Grossman regarding Fee Agreement – Telephone conference with Liz Grossman's associate. | .40 |
| 11/15/02 | Meet with Liz Grossman. | .30 |
| 11/18/02 | Call Steven Landis regarding motion by Dan Ryan. | .10 |
| 11/21/02 | Telephone conference with Liz Grossman regarding inspection of documents | .30 |
| 11/27/02 | Review Dan Ryan's claim and discuss with Adam. | .40 |
| 11/29/02 | Meet with Adam to discuss status of Susan's representation and meeting with Liz Grossman. | .80 |
| 11/30/02 | Meet with Adam to discuss meeting with Liz Grossman – Meet Liz Grossman at house. | 2.00 |
| 12/06/02 | Telephone conference with Liz Grossman. | .30 |
| 12/09/02 | Review and locate documents requested by Liz Grossman. | 1.00 |
| 01/08/03 | Telephone conference with Liz Grossman | .50 |
| 01/09/03 | Review bill from Liz Grossman – Forward to Adam. | .20 |
| 01/13/03 | Telephone conference with Liz Grossman | .50 |
| 01/15/03 | Meet with Liz Grossman | 1.00 |
| 04/01/03 | Correspondence to Beverly Lyon | .50 |

*Budd E. MacKenzie*
*A Professional Corporation*

Total Hours 22.30 @ $275 Per Hour  =    $ 6,132.50

Out-of-pocket Expenses:

10/25/02 Mail Boxes Etc. Notary–For
Adam Polk–Power of Attorney                 $      10.00
                                            $ 6,142.50
Retainer received                       ($15,000.00)
Credit Balance on Account               ($ 8,857.50)


**Credit Balance on Account  $ 8,857.50**

```
 0•80   +
 0•60   +
 3•50   +
 3•70   +
 0•80   +
 2•00   +
 0•80   +
 1•50   +
 0•30   +
 0•40   +
 0•30   +
 0•10   +
 0•30   +
 0•40   +
 0•80   +
 2•00   +
 0•30   +
 1•00   +
 0•50   +
 0•20   +
 0•50   +
 1•00   +
 0•50   +
023•••••••••••
22•30   *
```

1    Unknown (off camera): With that long family history, is it possible that you might have come to

2    a different verdict? Had the defense been battered woman finally snapped, rather than

3    self-defense?

4

5

6    BOB BORKENHAGEN: I don't believe so.

7

8    JASON MACDAVID: (from the back) I think going back to, umm, what we had said earlier, we

9    went though and assessed her markings and that type, and if the things that she said had

10   happened, then, like they would have said, there would have been more evidence of that as well.

11

12

13   Unknown (off camera): You need more evidence of her having more injuries?

14

15   JASON MACDAVID: (from the back) That is correct.

16

17

18   LISA CRISTWELL: (from the back) The lack of injuries was huge.

19

20   Jurors: All nodding.

21

22

23   JASON MACDAVID: (from the back) I think the way she postulated and formulated this whole

24   scene, umm, with the evidence we were shown, the pictures, umm, and the descriptions that we

25   got from Mr. Wicks, ahh, it was un-plausible, it was unfeasible, what she stated, could have

26   happened. It just couldn't have happened.

27

28                                          Page 34 of 36



September 19, 2007
2659 E St, Apt A
San Diego, CA 92102
tel: 619-239-7240

I Helen D. Bolling state under penalty of perjury that the following is true to the best of my knowledge & belief:

1) I am the mother of Susan Bolling Polk; She married Frank Felix Polk in 1981.

2) Felix did not have any assets when he married Susan; he was without assets after dissolving his prior marriage.

3) I loaned Susan & Felix the money to buy their 1st home in Piedmont & I also loaned them the money to buy their 1st apartment bldging in Berkeley in 1982 which they converted to a home; those loans were never repaid in full because they were struggling to meet their expenses with young children

4) In 1991 I purchased an apt bldg in Berkeley for all cash (the Arch St Prop); I gifted 1/2 of that property to Susan but Felix wanted it recorded in his & Susan's name  as tenants in common.  I agreed for strategic reasons because of the Berkeley rent control ordinance which has a clause that benefits "tenants in Common."  However my gift & loans were intended for Susan's benefit.

5) In 1991 Susan & Felix asked me to refinance so they could buy a Piedmont Apt bldg: I refinanced & they received $160,000.  In 1991 We signed an agreement that I would be repaid $109,000 + 5%  of the sales price plus 50% of the net sales proceeds if & when we sold the property

6) Over the years I allowed Susan to manage the property & to use the income to improve the property & to meet her own expenses with the remainder with the idea that in time I would be repaid in in full.

7) In 2003 John Polk sold the property for $1,035,000 & I received about 1/2 of the proceeds without any consideration for the loan repayment as I'd understood I could expect from his attorney Budd Mackenzie.

8) When that didn't happen I understood form Mackenzie I would be paid when the house in Orinda was sold and the estate settled because money was needed to make payments on my daughter's home in Orinda.

9) It was also my understanding that my daughter would receive her share from the sale of the Arch Street property & I'm shocked to hear she didn't receive anything.

10) I am owed the amount set forth in the 1991 agreement referenced above ($109,000+5% of the sales price) + interest from 1991.


signed Helen D. Bolling

*Helen Bolling*

**Budd E. MacKenzie**
*A Professional Corporation*

Exhibit A
Declaration Re: Request For Extraordinary Compensation

Polk
Estate

February 6, 2008

## PROFESSIONAL FEES OCTOBER 2002 THROUGH JANUARY 2008

10/17/02    Telephone conference with Andrew Polk – Telephone conference with Barry Morris – Telephone conference with Steve Landes – Telephone conference with Helen Bolling – Telephone conference with Jim Calhoun regarding homeowner's insurance policy and renewal of same – Prepare asset list – Call regarding assets – Meet with Gabe, Adam, Dan Briner – Numerous other calls.        7.50

10/18/02    Prepare for and meet with Andrew and Jennifer – Meet with Andrew, Jennifer, Dan Briner, Adam, Gabe – Numerous calls to gather information on assets, status of criminal proceedings – Visit Bank of America-Piedmont regarding safe deposit box – Call Helen Bolling – Telephone conference with attorney Beverly Lyon to determine whether there was a will – Legal research – Telephone conference with Barry Morris.        8.50

10/19/02    Meet with Andrew, Jessica and Jennifer – Assist with attempt to locate will at office and home – Visit home - Review and collect documents to determine which were critical – Telephone conference with Frank Moore – Meet with Dan Briner and Adam.        7.00

10/20/02    Telephone conference with Dan Briner – several calls – Telephone conference with John Polk – Telephone conference with Barry Morris – Review documents which had been retrieved from house – Review documents and organize files.        2.50

10/21/02    Attend hearing –  Conference with Adam – Telephone conference with Dan Briner –Call Bank of America – Telephone conference with

*1985 Moraga Road, Suite #214*
*Lafayette, California  94549-4433*

*Phone: 925/299-2010  Fax: 925/283-1134*

3

1   SEPTEMBER 10, 2004                      10:18 a.m.

2                     ---oOo---

3               P R O C E E D I N G S

4         MR. O'CONNOR:  Yes.  I'd call Judge Kolin to the

5   stand.

6                **JUDGE WILLIAM M. KOLIN**

7      *called as a witness, having been duly sworn,*

8      *testified as follows:*

9         THE CLERK:  Thank you.  Please be seated.  If you

10   can tell us your name for the record.

11         THE WITNESS:  William Kolin, K-O-L-I-N.

12                **DIRECT EXAMINATION**

13   BY MR. O'CONNOR:

14     Q.  I guess we can forgo the background.

15         THE COURT:  Let's get right to it.

16         MR. O'CONNOR:  Okay.

17     Q.  Judge, I want to ask you about a contempt hearing

18   that occurred on April 16th of 2002 involving Susan Polk.  Do

19   you have a memory of that?

20     A.  Generally.

21     Q.  Okay.  Do you see Susan Polk in court here today?

22     A.  Yes.

23     Q.  And she's the woman sitting to my far right?

24     A.  Yes.

25     Q.  Can you tell us what that contempt proceeding -- why

26   you initially found Miss Polk in contempt?

27     A.  Well, there were a lot of reasons.  Generally, she

28   was having a difficult time controlling herself in court, and

*VALERIE S. PRINCE - CERTIFIED SHORTHAND REPORTER #7946*

1    Q.    Particularly when minors are remanded, I think in
2    this case to the Boys Ranch?

3    A.    Well, that occurred at some later date, but I think,
4    if I'm not mistaken, there was originally a release on
5    electronic monitoring and then the Ranch was later.  Maybe I
6    don't have the sequence of events correct.

7    Q.    There was a period of time where -- well, do you
8    have a recollection that there was a period of time where the
9    minor in this case, Eli, had been remanded following what we
10   would refer to as a JEM violation, a violation of the juvenile
11   electronic monitoring rules?

12   A.    Generally I recall that.  Is that the cutting off
13   the bracelet situation?

14   Q.    Yes.  Yes.

15   A.    Okay.

16   Q.    And do you have a recollection that -- I realize
17   it's been some time, but there was an issue about the location
18   where the minor in this case, Eli, was residing, whether it be
19   in Alameda County or at the mother's home in Orinda?

20   A.    Yes.

21   Q.    And that the net result of that was the Court at
22   least at some point had found the minor, Eli, in violation of
23   the JEM agreement?

24   A.    Yes.

25   Q.    And isn't it the case that regarding the proceeding
26   wherein Miss Polk was summarily held in contempt that she had
27   basically stood up to leave the courtroom after her son was --
28   it was indicated the son was going to be taken into custody?

*VALERIE S. PRINCE - CERTIFIED SHORTHAND REPORTER #7946*

1    the case.

2        Q.    Do you recall whether or not the attorney identified

3    as Ms. Ramirez, who was representing Eli Polk, had made

4    references to you that Ms. Polk was somehow the problem in the

5    case?

6        A.    I don't recall that specifically.  I know

7    Miss Ramirez had some difficulty she expressed in representing

8    Eli throughout the case, but I'm not sure exactly the

9    specifics of it, I'm sorry.

10        Q.    And would it be fair to say that you're not aware of

11    the actual retainer arrangements made between the family and

12    Ms. Ramirez?

13        A.    No, I am not.

14        Q.    Do you happen to know a person by the name of Budd

15    MacKenzie, an attorney?

16        A.    Yes, I do.

17        Q.    Is he a personal friend?

18        A.    Yes, he is.

19        Q.    Have you discussed this case with him?

20        A.    Yes.

21        Q.    Did you know him prior to the proceedings in April

22    of '02?

23        A.    Yes.

24        Q.    And do you recall that in a prior appearance in

25    March of '01 that you were a judge who authorized a protective

26    restraining order against Dr. Polk relative to Ms. Polk?

27        A.    I don't recall that.

28        Q.    Let me rephrase that.  Do you have a recollection

1        h. Assisting the accountant who was hired to prepare the personal
2 and corporate tax returns for Felix Polk and his practice.

3        10. I was required to prepare and file a motion in Alameda Court
4 to transfer the original will to Contra Costa County, when the Bank of
5 America mistakenly filed the will in the wrong County.

6        11. Media inquiries were referred to me and were frequent. The
7 decision was made to not try the case in the press. At the same time
8 it was important to be aware of and respond to false allegations being
9 made by Susan Polk.

10        12. I was subpoenaed as a witness by Susan Polk in her criminal
11 proceeding and required to go to court. Ultimately, I was not called
12 to testify during the trial.

13        14. When Susan Polk was released on bail she and Eli went
14 to Gabriel's school and took the automobile Gabriel was using for
15 transportation. This was done without his knowledge or consent and was
16 a violation of the terms of her bail conditions. I was asked to
17 contact the District attorney's office to assist in recovering the
18 vehicle and to obtain personal property; Gabriel had left in the car.

19        15. At John Polk's request I interviewed a guidance counselor who
20 was hired to assist Eli in locating a school he might attend.

21        16. I have been required to respond to several attempts by Susan
22 Polk to have John Polk removed as executor of the estate. Each time
23 she filed allegations, John Polk was required to respond.

24        17. I arranged for a successful work out agreement with
25 Citimortgage, holder of a first deed of trust, secured by the Miner
Road Property. This was done to avoid foreclosure by Citimortage.

- 5 -

DECLARATION OF BUDD E. MACKENZIE

*O*

| | | |
|---|---|---|
| 09/30/04 | Message from Pam Ty – Respond to  – Telephone conference with John Polk regarding bail bond – Telephone conference with John Polk regarding bail bondsman Tom Toler. | .60 |
| 10/01/04 | Telephone conference with Adam – Dan Briner – update – and Pam Ty – Telephone conference with John Polk. | .70 |
| 10/04/04 | Telephone conference with John Polk regarding car and pension plan Telephone conference with Adam –Call Tom O'Connor – Review/file correspondence from John Polk/Susan Polk – Telephone conference with John Polk regarding insurance for Dodge – Telephone conference with John Polk regarding status of trial – Telephone conference with Tom O'Connor – Call Adam – Call Dan Briner regarding status – Review documents. | 2.10 |
| 10/12/04 | Review letter from Susan Polk to John 10/5/04 and 10/7/04 – Telephone conference with Adam regarding status. | .30 |
| 10/14/04 | Telephone conference with Dan Briner and John Polk – status – Review correspondence between Eli and Peter Weiss. | .30 |
| 10/15/04 | Review letter from John Polk to EBSA 10/14/2004 – Call John. | .10 |
| 10/18/04 | Telephone conference with John Polk regarding correspondence from Susan. | .10 |
| 10/20/04 | Telephone conference with Dan Briner – Update – Telephone conference with John Polk regarding Scottsdale Insurance claim. | .40 |
| 10/22/04 | Review letters from Susan dated 10/21/04 to Adam, John and me – Call Adam – Telephone conference with Dan Briner. | .60 |
| 10/26/04 | Telephone conference with John Polk regarding accounting and status update. | .30 |
| 10/28/04 | Telephone conference with Tom O'Connor – Telephone conference with Adam – Telephone conference with John Polk  – Telephone conference with Dan Briner regarding continuance of trial. | .60 |
| 10/29/04 | Telephone conference with John Polk. | .10 |



09/13/04    Telephone conference with John Polk regarding status – Review
            proposal from Susan Polk – Call Adam –Locate documents.    1.00

09/16/04    Telephone conference with Adam regarding Eli threat – Call Tom
            O'Connor – Prepare list of receipts and disbursements – Call
            inheritance referee – Telephone conference with Dan Briner –
            Telephone conference with John Polk – Call from Jennifer Polk –
            Several calls.                                               2.80

09/17/04    Telephone conference with John Polk regarding preparing accounting
            of receipts and disbursements and status update – Meet with Gabe
            and Adam regarding status – Telephone conference with John Polk
            regarding same – Telephone conference with Tom O'Connor –
            Telephone conference with Dan Briner.                        2.00

09/20/04    Telephone conference with John Polk regarding Susan and Eli's
            demands 9/19/04 – Telephone conference Financial Aid Office
            UCLA – Letter to same – Telephone conference with Adam –
            Telephone conference with Peter Weiss – Call Tom O'Connor –
            Telephone conference with Tom Toler regarding Susan Polk bail
            bond  – Telephone conference with John Polk regarding status and
            claims – Review creditor claims –Telephone conference with John
            Polk regarding accounting for receivables.                   2.70

09/24/04    Telephone conference with John Polk regarding Adam's schooling
            and preparation of receipts and disbursements – Revise request for
            continuance of status report.                                .30

09/27/04    Telephone conference with John Polk regarding Adam's support
            while at school – Telephone conference with Tom O'Connor – Call
            John Polk – Telephone conference with Pam Ty – Revise request for
            continuance in probate proceeding.                           .60

09/28/04    Review and file fax from Susan Polk dated 9/28/04.           .10

09/29/04    Call Pam Ty and John Polk regarding Susan Polk's demand letter of
            9/28/04 – Prepare letter to Susan Polk –prepare proposed court order
            regarding continuance – Telephone conference with Tom Toler
            regarding bail bond payment – Telephone conference with Florence
            Hairston regarding Bank One credit card claim.               2.0

To the honorable Judge in the matter of the case of the people vs. Susan Mai Polk, case number 01-118520-6:

I am Adam Eric Polk, son of the accused, am writing the following in lieu of appearing personally due to the date's conflict with my school and occupation. The purpose of this document is essentially to convey my feelings concerning my mother and her case. I am not writing this to speculate about who did what or why in the cottage at my old home on October 13 or thereabouts. Only my mother, my father, and God truly know that. It is not my place to determine innocence or guilt; I am not an attorney or a judge. I am simply a college student, a brother, and a son. The best I can do, without over stepping my capacity as a student, is to clue those who receive these words into just how I view my mother and my family's unfortunate situation. This being said, I would primarily like to say that my mother is not a murderer. Despite her accusations, and the evidence against her, she is not inherently a killer. Growing up, no one could have asked for a gentler, sweeter mother. To think of her in prison shames and pains me daily. I know my mother as a troubled, sometimes irrational, but gentle intellectual who loves movies, reading, and cooking food, and/or baking cookies. I would plead with the court to see past her accusations and release her from jail.

Sincerely,

Adam Polk

| | | |
|---|---|---|
| 09/06/05 | Telephone conference with John Polk regarding need for funds and accounting for expenses – two calls. | .30 |
| 09/14/05 | Prepare request for continuance of hearings. | .60 |
| 09/15/05 | Finalize request for continuance. | .10 |
| 09/20/05 | Telephone conference with John Polk regarding Bank of the West foreclosure – Telephone conference with clerk regarding continuance hearing. | .10 |
| 09/21/05 | Telephone conference with John Polk regarding Bank of the West foreclosure. | .10 |
| 09/22/05 | Telephone conference with Ivan Golde – Susan Polk's attorney in criminal proceedings regarding estate and foreclosure – Telephone conference with Adam – Telephone conference with John Polk regarding Citimortgage. | .80 |
| 09/23/05 | Telephone conference with John Polk regarding Citimortgage loan delinquency and possible foreclosure action – Review Citimortgage file – Telephone conference with Citimortgage and John Polk regarding work out agreement – Memo to file – email to John, Adam and Gabe – Discuss status of criminal trial, actions of investigator, and bail hearing with Dan Briner. | 1.00 |
| 09/27/05 | Review letter agreement sent by Citimortgage – Correspondence to John Polk regarding same. | .30 |
| 09/28/05 | Telephone conference with John regarding Citimortgage. | .30 |
| 09/29/05 | Prepare for and appear by telephone status conference hearing. | .90 |
| 09/30/05 | Telephone conference with John Polk regarding Citimortgage. | .20 |
| 10/04/05 | Telephone conference with John Polk regarding requests from Dateline – Telephone conference with Falguini. | .60 |
| 10/05/05 | Review declarations for meeting with Falguini Lakhani – Review Grand Jury transcript – Meet with Falguini Lakhani – Telephone calls with her and John Polk regarding Dateline report – Several calls – Telephone conference with John Polk's son. | 4.20 |

1 narcissistic personality disorder he needed more.  He
2 needed worship, not a wife.

3         What happened to Susan, as the victim in this,
4 is that she didn't get better, she started to feel
5 self-conscious, shy, and I showed you what the school
6 records showed before that, they thought maybe she was
7 too gregarious.  And she felt suicidal.  She had never
8 felt like that before.  This is when Susan got arrested
9 for shoplifting.

10         Now, Susan then was confined to juvenile hall.
11 She was put into a girls center.  This was great, she was
12 away from Felix.  However, it didn't work, because Felix
13 was aligned with the schools and the probation people,
14 and guess who came to visit her at the girls hall?  Felix
15 Polk.  Susan will tell you that when this happened she
16 was terrified, and that she panicked, and that she ran
17 away from the girls home.  And what she did was she
18 hitchhiked a ride from somebody right here in Martinez
19 and went to some friend's house in Trestle Glen in
20 Oakland, which for those of you who know, it is really a
21 lovely area of Oakland.  And she lived there for a month.
22 And she did not tell her mother where she was.  And she
23 did not tell Felix where she was.  And I think you know
24 what that's about.

25         But she was still young.  And she finally broke
26 down and called her mother.  She missed her mother.  And
27 then Helen Bolling, and you'll meet her, and we'll ask
28 her, I mean, we'll try to ask the hard questions.  Didn't

1 of an anything goes era, which is going to help explain a
2 little bit how a 15, 16, 17 year old can get involved
3 with a 40, 41, 42 year old therapist.  And even though
4 people in her group therapy knew about it nothing was
5 done.  It's a little different now.

6        But at 12 Susan was acting up a little bit.
7 Susan was being incorrigible at home, according to her
8 mother Helen.  And probably our first witness will be
9 Helen Bolling.  Helen Bolling will testify about Susan's
10 early years.  Ivan Golde will be questioning her.  Ivan
11 Golde will probably be questioning at least a third of
12 our witnesses in this case, and helping me by taking the
13 wrong pictures off the projector.

14        One thing that Ivan will introduce is the idea
15 of what Susan was like before she met Felix Polk.  And
16 Helen Bolling will show you this.  This is something that
17 Susan made when she was about 14 for her brother David.
18 You see Susan, at about 14, stopped going to school.
19 Susan, at about 14, started to stay home.  And she was
20 watching TV, but she was also reading the Russian
21 classics.  Tolstoy, Dostoevsky.  I'll show you later on
22 during the trial through Susan and her mother some of her
23 writings at that age, they're stunning, they're college
24 level at age 14, 15.  You won't believe it when you read
25 it.  She was doing art like this.  This is made of
26 leather.  And she made it for her brother David, so that
27 he could put it on the back of his Levi jacket, because
28 those of you who remember those days we all wore Levis,

**MSNBC.com**                                                                              $S_S$

# 'Scarborough Country' for Oct. 17th

Read the transcript to the Monday show
updated 9:31 a.m. PT, Tues., Oct. 18, 2005

Guests: Jack Kilian, Max Kellerman, Nancy Pelasara, George Malim, Barry Morris, Joe Tacopina, Susan Filan

CATHERINE CRIER, GUEST HOST: Well, right now, in SCARBOROUGH COUNTRY, in cold blood. This prominent defense attorney told friends he lived in fear. Then he came home to find his wife murdered in their front hall.

Tonight, police scour every inch of the couple's sprawling property, searching for clues. And we will have the latest on this legal murder mystery.

Plus, the Louisiana attorney general investigates the death of 215 people in New Orleans hospitals during Hurricane Katrina. How did they die? Were they victims of mercy killings? Troubling questions. And we will have more on that story tonight.

ANNOUNCER: From the press room, to the courtroom, to the halls of Congress, Joe Scarborough has seen it all. Welcome to SCARBOROUGH COUNTRY.

CRIER: Thanks so much for being here tonight. I'm Catherine Crier from Court TV, in for Joe, who is taking a few days off. And we will have those stories in just a minute.

Plus, the very latest on the Taylor Behl case. The key suspect changes his story again and says Taylor died during rough sex. Taylor's family is outraged. We will get reaction from her grandmother and what the police plan to do next.

But, first, the brutal killing of Pamela Vitale, the wife of defense attorney Daniel Horowitz. In a bizarre twist, Horowitz was the lead attorney defending Susan Polk, who is accused of brutally stabbing her husband. Could there be a connection between the cases? Or did Horowitz and Vitale live in fear of a deranged neighbor who might have committed the crime?

And breaking news tonight, as police search the Horowitzes' properties for clues.

For more on the mystery, we're going to live out to California and Noelle Walker of NBC station KNTV.

Noelle, what's the very latest?

NOELLE WALKER, KNTV REPORTER: Catherine, we know this case is far from being closed yet.

In fact, as you said, as the sun sets here on the West Coast, investigators are back out at the sprawling 12-acre property owned by Daniel Horowitz and his wife, Ms. Vitale. It is a 12-acre property that includes several structures, among them, a mobile home where Pamela Vitale was murdered.

It sits in the shadow of a huge four-story mansion that the couple was building, said to be their dream home. We know that investigators have questioned dozens of people, to include Daniel Horowitz and a neighbor who has been described as a caretaker.

Now, an interesting footnote about that neighbor. I have a restraining order right here, a temporary restraining order that was filed by Daniel Horowitz. The date is June 23 of this year. In this paperwork, Daniel Horowitz described his neighbor as being someone who was good at heart, but he described some very erratic behavior, says this person has some drug problems and that he feared for his and his wife's safety because this neighbor had become increasingly violent.

Chilling, at the end of this statement, he says, "I have phrased this declaration in personal terms, but most important to me is that he stay away from my wife, Pamela." Now, we do not know if this has anything to do with Pamela Vitale's murder.

In fact, police have made, or sheriff's investigators I should say have made no arrests in this case and yet they say they have ruled no one out. Now, as for the other development in this case, as you mentioned, the judge in the trial of Susan Polk has declared it a mistrial, said there was really nothing else to do under these extenuating circumstances.

We know that that trial has been postponed to December 2. We do not know if this attorney will be involved in that case. He had said earlier today to one of my colleagues that he would not set foot in a courtroom until he knows what happened to his wife.

Now, earlier today, the sheriff's department held a press conference and gave some glean of information as to what might have happened to his wife.

(BEGIN VIDEO CLIP)

JIMMY LEE, SPOKESMAN, CONTRA COSTA COUNTY SHERIFF'S DEPARTMENT: The cause of death. The cause of death is listed as blunt-force trauma to the head. The manner of death is listed as homicide. From the moment we received this case, we have approached this case as a homicide.

(END VIDEO CLIP)

WALKER: Now, as we speak right now, the search is continuing—so, back to you, Catherine.

CRIER: All right, Noelle, Let me ask you a couple of questions. It was reported that Dan Horowitz helped the police try and reconstruct events. He went through the house to see where breakfast dishes were, other things, to try and figure out at what time this occurred. Do you know what they were able to piece together there in the home?

WALKER: You know, that press conference they held that everybody from the media was here to cover, it was all of three, maybe three-and-a-half minutes. The only information they released was that the autopsy took three-and-a-half hours, that she died of blunt-force trauma, that as they had gleaned from the very beginning that they were considering this a homicide, that she had been killed, but other than that, they're releasing really precious few details about what happened on that property.

So, whatever Mr. Horowitz told investigators, investigators are not releasing that information right now.

CRIER: All right.

Well, I want to bring in our all-star panel at this point, Barry Morris, a criminal defense attorney and good friend of Daniel Horowitz, Susan Filan, former prosecutor and criminal defense attorney, and defense attorney Joe Tacopina.

All right, I want to start with you, Joe.

You have got a lawyer that will be the first person that police look. I think anyone who knows Dan Horowitz would be very, very hard-pressed to think that he had anything to do this. But he did say, I was put in the back of a squad car. I expected them to do that. But then I helped them reconstruct.

Would you be giving him any other advice at this point in time?

JOE TACOPINA, TRIAL ATTORNEY: I think Dan knows how to take care of himself in this situation, you know.

But this is something that is just so far beyond the pale. You don't

even in his profession, our profession, you know, dealing with some of the bottom-feeders we—sometimes we to deal with, you just don't envision yourself in that position, even though you counsel people in that position all the time.

But, obviously, I don't think and I'm pretty sure that no one's going to be, at the end of the day, looking at Dan Horowitz as a suspect in this thing. But, look, it's natural, Catherine. Any time a spouse is murdered and there's no obvious suspect, the first person they're going to go to is the surviving spouse and that's just good police

work.

CRIER: Well, there is this—quote—"caretaker" apparently sold Dan Horowitz the property, and, as part of the deal, was allowed to live in a trailer on the home—on the property for an extended period of time. But Dan never filed a restraining order.

This is an obvious place to look, but he also apparently had had various harassment concerns about prior clients. Does that sort of come with the territory?

TACOPINA: Yes, depending on your clientele is. And Dan's clientele was a lot of drug dealers, a lot of people in violent gangs. And that does come with the territory, although, I got to tell you, it's still a rare thing, Catherine.

Look, if you think about it, when was last time you heard a defense attorney, no matter how drastic some of their clients could be, being subject of something like this? Last year, we had a prosecutor, a year and a half ago, we had that federal prosecutor near Philadelphia, he was killed. A few years—maybe a few months ago, even, maybe a year ago, we had on national TV, on Court TV, on your show, that matrimonial lawyer who was sort of hovering behind a tree getting popped at.

(CROSSTALK)

TACOPINA: So, as lawyers, either in matrimonial work or criminal work, you're dealing with people in just such emotionally unbalanced states at times. And it's always a risk, but you don't expect this, especially as a defense attorney.

Don't forget, you are the one, their last bastion of defense, if you will. Even if these people are bad to the bone, you're still the one out there trying to preserve their constitutional rights. And I think that's generally something at least someone like that even appreciates.

CRIER: Well, absolutely.

And, earlier tonight, I was talking to someone who knows him very, very well, saying, most of his clients loved this man. He really gave himself to his cases.

Let me bring in Barry.

Barry, you have been close to the Felix Polk family, to Felix Polk for years. You still have an involvement with the family. You may well be testifying in the Polk case. Are police looking at any family members as persons of interest?

BARRY MORRIS, FRIEND OF DANIEL HOROWITZ: Well, the police have interviewed several people, including several members of the family.

But I think they're just casting a wide net, because I don't know what the clues they have, but it seems like they're just checking with everybody to see if anybody has any kind of information.

But nobody in the family has any kind of motive. I mean, you know, Dan's wife was a wonderful person. And I don't even know if anybody in the Polk family knew her, except in terms of her relationship with Dan. It's just entirely unlike—I think they're unrelated, frankly.

CRIER: Well, what about the—I won't say possible break-in, but there was some report about a door being jimmied at the Polk house. I'm not sure whether the son Eli reported this or another, but there was some concern there might have been an attempted break-in Saturday as well there.

MORRIS: This is the first I'm hearing of it.

CRIER: OK. Well, it was very much something about a door being jimmied. And they weren't satisfied. The police weren't satisfied that in fact someone had attempted to get into that.

What about interviewing with the two sons, because it's quite a controversial trial, in that two of the sons are—basically, one's going to testify for his mother that dad planned to go after her and the other that mom planned to

go after him. So, you're saying there aren't necessarily the kind of feelings that could move over into this sort of event?

MORRIS: Well, first of all, the two sons—there's Eli, who is testifying for his mom. Well, sort of the flip side of what the other attorney was just saying, this is the man representing his mom, so why would he want to harm anybody?

CRIER: But Gabriel was set to testify today, I believe. And he was going to testify that his mother, in fact, planned to kill his father.

MORRIS: Well, I have known Gabe since he was in kindergarten. And the police already talked to him and they checked to see if any marks.

There's no way on God's green Earth that Gabe would have done anything like that. He's just not that kind of person. He had the unfortunate position to be there when his mother killed his father and being the first person to find the body. So, Gabe is a good person. This is not something that he's capable of doing.

CRIER: Well, as we just said, you look at everybody in this case, including Dan, even though it would be hard for anyone to imagine his involvement.

Susan, let me ask you about the case itself, because, in a bizarre twist, now the Costa County Sheriff's Department law enforcement is looking into the murder of Pam Vitale. And this is the very group that investigated murder in the Polk case that Dan Horowitz would have to cross-examine and go after, basically, defending his client.

Do you think this will affect his representation of Susan Polk when the case is reset?

(CROSSTALK)

SUSAN FILAN, FORMER PROSECUTOR: No, I don't, Catherine.

But, first, please let me offer my condolences to Daniel Horowitz.

CRIER: Oh, absolutely.

FILAN: What a sweet man.

And the irony of this is, he's so passionate about defending people accused of murder. And here he is now cast in the same net as someone who may be a person of interest himself. I don't believe for one minute that he is. But what an awful position, for him now to need his own defense attorney.

(CROSSTALK)

FILAN: But, as far as the same people investigating this case that he would have had to cross-examine, law enforcement is law enforcement. And they're basically pure-hearted, good-spirited people, and they want to help. Here's a problem. They're going to solve it.

The Polk case was a problem to be solved. This is a problem to be solved. And it really doesn't matter what side of the fence you're on. In end of, law enforcement's job is to solve a gruesome murder. We have victims here. We have...

(CROSSTALK)

FILAN: I'm sorry?

CRIER: Go ahead, Joe.

MORRIS: I'm sorry.

(CROSSTALK)

Case 3:08-cv-02344-MMC     Document 3-2     Filed 05/13/2008     Page 28 of 53

MORRIS: If I could interject, there is a real problem. The same coroner who did the autopsy on Felix Polk is the coroner who did the autopsy on Dan's wife.

CRIER: What's the problem?

MORRIS: Well, the problem is that he was planning on attacking the coroner's findings in the Polk case. And, in fact, his co-counsel raised this as an issue as a possible conflict and it's a possible reason why Dan might not go on.

(CROSSTALK)

FILAN: These are professional people here. And that's not going to get in the way of an opinion.

(CROSSTALK)

TACOPINA: Catherine.

(CROSSTALK)

CRIER: Joe, you wrap it up for me.

TACOPINA: Any good defense lawyer, any good prosecutor, any good police officer understands and knows how to separate your personal life from your professional life.

FILAN: Yes. Exactly. Well said.

TACOPINA: As a defense lawyer, I could vigorously attack an agent, an FBI agent, or a police officer, if I don't think they're being candid or if I just need to undermine their credibility, but yet I have done it and I'm also friends with some of the same people I have cross-examined.

CRIER: Sure.

TACOPINA: You have to understand your roles.

And if you sort of understand and outline and frame your role, it doesn't make you not a human being. Dan is a grieving victim. And he is someone who I'm sure is going to cooperate with the police to try and make sure someone is convicted of doing this to his wife. So I don't think he's going to play defense attorney. And I don't think he needs a defense lawyer either, by the way.

(CROSSTALK)

CRIER: Hold on, Barry.

Some attorneys might build animus, but this is one that certainly does not.

And, certainly, as you all spoke, our condolences to Dan Horowitz and his family.

Barry Morris and Noelle Walker, thank you very much.

Now, when we come back, tales of mercy killings, as Katrina floodwaters rushed in. The latest on the investigation into what may have happened in the darkest hours of this deadly storm.

And an amazing rescue. With time running out, police and good samaritans pull a driver from a burning car. And you will hear from the people who risked everything to save a life.

Stay with us.

(COMMERCIAL BREAK)

CRIER: The bizarre twist in the Taylor Behl case. Is the prime suspect finally telling the truth about how she di We will hear from Taylor's family tonight.

**FindLaw**
Legal News and Commentary
http://news.findlaw.com

Thursday, June 1, 2006

## Accused killer Susan Polk lashes out at prosecutor, former defense lawyer By Lisa Sweetingham, Court TV

(Court TV) — In her second contentious day of cross-examination, murder defendant Susan Polk accused the prosecutor of using "doctored" autopsy photos of her husband's stab wounds and accused a former attorney of "setting up" a teenager in a murder case.

"I wonder if that photo has been manipulated by a computer program," Polk said when Assistant District Attorney Paul Sequeira showed jurors graphic pictures of the gashes to the inside of Felix Polk's hands.

"I've cut my fingers a number of times in the kitchen, and it just doesn't look like that," Polk said.



THE LAW FIRM
BUSINESS CENTER
Business resources
from FindLaw
to help your
law firm succeed

**Learn more**

**FindLaw**

"Right,"
Sequeira said. "Because you never grabbed at a knife blade to save your life."

Medical experts have testified that Felix's incise wounds on his palms and index fingers were likely a result of trying to block or grab the paring knife Polk stabbed him with in October 2002.

"It's just gaping. And wounds to the hand made with a knife — I've never experienced anything gaping like that," Polk said of one photo, adding later that it appeared to be magnified for exaggerated effect. "It

really does look to me like that's been doctored."

Polk initially denied any knowledge of her 70-year-old husband's death when she was arrested more than three years ago. The 48-year-old housewife later admitted to stabbing him, but said she acted in self-defense during a fight amid their nasty divorce battle.

"The fact that I escaped relatively unscathed seems to be a very bad mark against me," Polk said when asked about Felix's multiple wounds on his torso, arms, hands, back and feet.

Photos shown to jurors indicate that Polk had red discoloration around her eyes, bite marks on one or both hands, and a red welt on her shoulder, but no knife wounds anywhere on her body.

"I think that was a very unfortunate miracle," Polk said.

### 'Frame job'

Polk was allowed to represent herself earlier this year after firing several attorneys. She was also granted a request last week to have attorney Gary Wesley sit behind her during cross-examination to consult with on legal objections.

By Wednesday afternoon, Polk announced without explanation that she was no longer keeping Wesley as advisory counsel.

Wesley told Courttv.com that Polk seemed indifferent to his advice.

Polk also testified that she fired her previous attorney, prominent California lawyer Daniel Horowitz, because she believed he conspired with the district attorney's office to "pin" the murder of his wife on 17-year-old Scott Dyleski.

"This D.A.'s office is extremely unethical and may have framed Scott Dyleski," Polk said. She claimed Horowitz's statements to her implicated him in the "frame job" and that she was prepared to testify for Dyleski.

"He told me, 'I set up Scott Dyleski,'" Polk said. "I was horrified that Mr. Horowitz said that ... it seemed to me that he was bragging."

Horowitz and co-counsel Ivan Golde had completed the

first week of Polk's first trial in October 2005, when Horowitz's wife Pamela Vitale was brutally murdered. The judge declared a mistrial and Polk fired Horowitz and Golde, but retained their office assistant, Valerie Harris, as her case manager.

Dyleski is allegedly linked to Vitale's murder through DNA, bloody clothes and other evidence. He is scheduled to stand trial in July.

Polk also accused Horowitz of carrying on an affair with a potential juror in her first trial.

"So, he didn't skip a beat," Polk said, "of going from one relationship to the next."

"All those things Susan Polk said are untrue," Horowitz told Courrttv.com Wednesday. "The truth, if I decided to tell it, would be things that are honest, things that would reflect kindly on me as a husband who suffered tragedy, and as a human being."

"If I did say what really went on during those days with Susan, and if I played the tape recording of the things she said were the reasons for why she was firing me, it would reflect poorly on Susan and make it more likely she would be convicted," Horowitz said. "And so I'm going to keep those things private, at least for now."

*[handwritten margin note: SHE WOULD BE CONVICTED]*

Sequeira alerted the jury to Polk's charges of a conspiracy since testimony began March 7, in which she has alleged misconduct by the judge and D.A.'s office, accused the clerk of falsifying the record, asked for a second court reporter to ensure the transcripts weren't being falsified, and accused a deputy of threatening her with bodily harm.

"Mrs. Polk, you will make false allegations against anyone ... anybody who crosses you, isn't that true?" Sequeira said.

"Exposing wrongdoing where one sees it: That's what it means to be an American, to be a whistleblower," Polk replied. "I don't make false allegations."

### A clean knife

Polk testified that after she survived her husband's alleged attack, she washed the black-handled paring knife — which was "everyone's favorite" knife because it was so sharp and versatile — she dried it and put it back in the kitchen drawer.

She said she wanted more time with her youngest son, Gabe, before deciding what to do about Felix. It was Gabe, then 15, who found his missing father's body late the next evening and called police.

"Did you use that knife the next night? Did you warn Gabe, 'Hey, don't use that knife?'" Sequeira asked.

"I don't recall," Polk said.

"Is it possible that Gabe used the knife to eat his dinner? " Sequeira asked. "The same knife that was used to kill his father?"

Polk balked at the suggestion and said she had no idea if the knife was ever used again.

"In emergencies, I get very fastidious. That's just who I am. I cleaned it and put it away," Polk said. "If you think that makes me a murderer? I mean, come on. But it makes a good story, so I guess you like that part."

"It's about the truth, Mrs. Polk," Sequeira said.

The prosecutor is expected to continue his cross-examination of Polk Thursday.

She faces 25 years to life if convicted of her husband's first-degree murder.

- **More**

---

Copyright © 1994-2008 FindLaw

1  murder.

2          In the end, when all this evidence is presented

3  to you, you will conclude that Susan Polk is guilty of

4  the murder of Felix Polk.  Thank you.

5          THE COURT:  Thank you, Counsel.

6          Does the defense wish to make an opening

7  statement?

8          MR. HOROWITZ:  Yes, Your Honor.  I don't know

9  if people want to wait while I set this up.  It should

10 not take more than two minutes.

11         THE COURT:  Okay.  Does anyone need a quick

12 break or are you okay?

13         Okay, all right.  Go ahead.

14         MR. HOROWITZ:  Okay.  Can everybody see what I

15 have up there easily enough?  To the degree that you

16 can't see what's up there, I'll explain most of it

17 anyway.

18         'The prosecution just told you that Susan Polk

19 stabbed her husband 15 times.  What I am showing you is a

20 portion of the grand jury testimony, when the prosecution

21 put on their own medical expert, and he said that there

22 were five, not 15, five, significant stab wounds.

23         Susan Polk defended her life against an attack

24 by a rageful, brutal, aggressive man, who is also her

25 husband.  He came at her with a knife.  She took the

26 knife from his hands as she was lying on her back.  And

27 she fought him off and she lived.

28         And there's nothing pretty.  There's nothing

55

1        She slashes his back, like you cut a steak,

2  there's a big gash in his back.  He's on top of her,

3  trying to get her wrist, get the knife, and you can see

4  the cuts on his hand as he's trying to grab, and on his

5  arm.  And then you can see the slashing on his belly as

6  he's moving in front of her arm and so on.  And then you

7  can see the five significant stab wounds that went in.

8        But let me tell you, none of those stab wounds

9  went in the full length of the knife.  None of those five

10  significant stab wounds have what maybe the doctors will

11  call hilt marks.  I like to call them handle marks, or

12  your hand marks.  If I have a knife, and I'm stabbing,

13  that bruises.  If I'm stabbing and not going through, it

14  doesn't.  A rage killing, as they deem it, a killing of a

15  helpless man, you're going to go all the way, and you're

16  going to hit and stop.  When you're on your back, and the

17  knife wounds are up and down and at different angles,

18  that's when somebody is trying to get you and attack.

19        At some point Felix's anger subsided, his rage,

20  and he called off the attack, and he stood up.  Our

21  experts will tell you that none of his wounds should have

22  killed him.  It's important for you for mental state,

23  because why would somebody stab somebody with wounds that

24  were not killing wounds if they wanted to kill?  Whereas

25  if they're just saying, Get off, that's different.

26        Dr. Wecht will tell you that they were not --

27  see they were not killing wounds.  But Felix had a very

28  bad heart artery, 75 percent occluded, I believe.  And

REDORBIT
your universe. online

# Polk Allowed to Represent Herself at Trial

By Bruce Gerstman, Contra Costa Times, Walnut Creek, Calif.

Jan. 21--A judge ruled Friday that Susan Polk can act as her attorney in her upcoming trial on charges that she stabbed to death her husband in 2002.

In a hearing that was calmer than many involving the 48-year-old Polk, who often argues with and interrupts the judge in court, Judge Laurel Brady granted her request to represent herself.

"I will expect you to behave in court," Brady told Polk. "There are consequences if you do not behave, as there are consequences for attorneys who do not."

Polk has pleaded not guilty to murder charges in the death of Felix Polk, her psychotherapist husband.

Polk had represented herself previously in court after firing three other defense attorneys, and before she hired Daniel Horowitz to defend her.

Polk told the judge last week that Horowitz has not paid enough attention to her case since the October killing of his wife, Pamela Vitale. The killing occurred just after the start of Polk's first trial and prompted Brady to declare a mistrial.

Polk's mother Helen Bolling, 72, watched the court proceedings in Contra Costa Superior Court in Martinez, and for the first time spoke about her daughter after the hearing. Bolling, who is frail but speaks with vigor, called her daughter's decision "a terrible mistake."

Horowitz told Brady he can no longer represent Polk because of potential conflicts of interest with his wife's homicide case. If he is a witness in his wife's case, he may be forced to testify and divulge information otherwise covered by attorney-client privilege.

"What I would say would be potentially harmful to (Polk's) case," he said, without disclosing details.

Polk is ready to try her own case, he said.

"I hope she presents the case in the way it should come out and show how victimized she was," Horowitz said after the hearing. "I was in a tough position of trying to tell Susan's story, but she didn't want me to."

Polk has said she killed her husband in self-defense.

Horowitz's co-counsel Ivan Golde said their relationship with Polk deteriorated after th

"I think she's got a lot of mental issues," he said outside the courtroom.

MENTAL
ISSUES

Bolling did not comment on Polk's mental state, but said the courts should prohibit her daughter from proceeding without a lawyer.

"They've allowed her to delay (her trial), delay it, delay it, delay it," she said. "The law has got to step in."

She depicted Polk as a victim of a therapist who abused his access to patients.

"None of us has been under the control of a psychologist, a head-doctor, since 141/2 years old," she said. "I think she has been damaged."

Deputy district attorney Tom O'Connor declined to comment.

"I have zero to say," he said as he rushed out of the courtroom. "Zero."

Polk's trial is scheduled to begin Jan. 31.

Bruce Gerstman covers Contra Costa Superior Court. Reach him at 925-952-2670 or by e-mail at bgerstman@cctimes.com.

-----

Copyright (c) 2006, Contra Costa Times, Walnut Creek, Calif.

Distributed by Knight Ridder/Tribune Business News.

For information on republishing this content, contact us at (800) 661-2511 (U.S.), (213) 237-4914 (worldwide), fax (213) 237-6515, or e-mail reprints@krtinfo.com.

Story from REDORBIT NEWS:
http://www.redorbit.com/news/display/?id=365357

Published: 2006/01/21 12:00:35 CST

© RedOrbit 2005

**.com.**    Member Center: Sign In | Register

**SEARCH**    ⊙ THE WEB  ○ CNN.COM    [                    ]  ( Search )

Home Page
World
U.S.
Weather
Business
Sports
Analysis
Politics
Law
Technology
Science & Space
Health
Entertainment
Offbeat
Travel
Education
Special Reports
Video
Autos
I-Reports

# TRANSCRIPTS    Transcript Providers

[ Shows By Category: ]

**Return to Transcripts main page**

## NANCY GRACE

**Client Makes Public Accusations About Possible
Involvement in Wife`s Murder**

Aired January 17, 2006 - 20:00:00  ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY
NOT BE IN ITS FINAL FORM AND MAY BE
UPDATED.

NANCY GRACE, HOST: Tonight, high-profile criminal
defense attorney Daniel Horowitz. Well, first Daniel
suffered the brutal murder of his wife, Pamela Vitale.
Well, now he`s been thrown off as lead defense
attorney in the Susan Polk murder case. Polk now making accusations that Horowitz killed his own wife.
Plus, breaking news tonight. First-degree murder charges handed down on 38-year-old Ben Fawley in the murder
mystery surrounding 17-year-old Virginia Commonwealth University freshman Taylor Behl. Remember Taylor? Her
body found buried in a shallow grave just one month after she vanished off campus.

Good evening, everybody. I`m Nancy Grace.

I want to thank you for being with us tonight.

**SERVICES**
E-mails
RSS
Podcasts
Mobile
CNN Pipeline

Tonight, breaking news in the Taylor Behl case out of Richmond, Virginia. Thirty-eight-year-old Ben Fawley indicted,
first-degree murder charges in the death of 17-year-old Virginia Commonwealth freshman Taylor Behl. Behl
disappeared just days into the freshman fall semester.

Plus, lots of nervous politicians in Washington. Powerhouse lobbyist Jack Abramoff at the center of a huge corruption
investigation.

But first tonight, high-profile criminal defense attorney Daniel Horowitz, remember his beautiful wife Pamela Vitale?
She was murdered in their California home. Well, now Daniel faces a new battle. His client, Susan Polk, on trial for her
husband`s murder, wants Horowitz booted off the case and is making horrible and very public accusations that Daniel
is involved in his wife`s murder.

(BEGIN VIDEO CLIP)

SUSAN POLK, WANTS TO FIRE DANIEL HOROWITZ: Essentially, there`s been a complete breakdown in
communication between me and Mrs. Horowitz which has increased since the death of his wife, Pamela. I could see
how certain statements that Dan has made to me could potentially be used in the defense of Mr. Dyleski, who is
charged with the murder of Dan`s wife.

In the absence of a confession from Mr. Dyleski, I will continue to have doubts as to whether Mr. Dyleski is guilty and
whether -- whether Dan Horowitz is innocent or not.

(END VIDEO CLIP)

GRACE: You know what? Stunning. Incredible accusations like that shot out like a bullet.

To Jim Moret, chief correspondent with "Inside Edition."

Jim Moret, she better have some backup for that. That is slander.

JIM MORET, CHIEF CORRESPONDENT, "INSIDE EDITION": Well, not only that, this interview is really dramatically different from when I talked to her, and that was right after Pamela Vitale's body was discovered. I talked to her a couple of times in jail, and at that time she was concerned.

You see here this is one of the interviews I had with her. She was concerned that it was her case that was responsible for Pamela Vitale's murder.

We've seen this woman. I frankly don't even know what to the think. She fired three other attorneys before. She represented herself before.

Perhaps she's nervous going into the trial, but I agree with you, these are horrible, slanderous statements. You and I were up there in northern California during this horrendous crime, and we spent time with Daniel, you spent a great deal of time with him, you toured the house.

The police have totally exonerated him. He is not a suspect. The suspect is in custody.

Daniel Horowitz, by all accounts, had nothing to do with his wife's murder. So to suggest such a thing is just horrific. And it's based on that that she wants to fire him as her attorney.

GRACE: What is this, just another way to get yet another delay, Jim Moret? Because as you know, every day you haven't been convicted is a day your innocent. Another day, just one more day of innocence. And by getting rid of a string of lawyers, she has gotten one delay after the next. But never has she stooped this low.

MORET: Well, when you talk about a delay, you know, this crime that she is accused of committing, murdering her husband, was in October of 2002. We're in 2006 right now.

So if you're talking about getting delays and extending this time even longer before a conviction, well, she's obviously been very successful. But, you know, the judge is going to have to make the determination of whether or not to relieve the counsel on this case because we're still now on the eve of yet another trial for her.

She was in trial when Daniel's wife was brutally murdered, and that -- that murder caused a mistrial in her case. But there is to be a trial in this case, and she really needs effective counsel.

GRACE: Take a listen to this.

(BEGIN VIDEO CLIP)

POLK: Essentially, there's been a complete breakdown in communication between me and Mr. Horowitz which has increased since the death of his wife, Pamela.

Aside from that issue of possibly being a witness in the defense of Scott Dyleski, I have other issues with Dan's representation, representation of me which I think that anybody who was aware of them would agree that their representation should end.

(END VIDEO CLIP)

GRACE: And that's not all, everybody. Don't think Daniel Horowitz is the only one feeling alone tonight. P.S., he's joining us in about 30 seconds.

Elly (ph), who else does Polk want thrown off her case?

UNIDENTIFIED FEMALE: She also wants the judge, Laurel Brady, off the case, as well as all the judges in Contra Costa County to recuse themselves from this case.

GRACE: OK. So she wants Daniel Horowitz off the case because she thinks he murdered his wife, and all the judges off the case in the entire Contra Costa County.

OK. I am hearing in my ear we are now being joined by Daniel Horowitz.

Hello, friend.

DANIEL HOROWITZ, DEFENSE ATTORNEY: Hi, Nancy.

GRACE: Daniel, response?

HOROWITZ: Nancy, it's painful to hear these things said about Pamela, but, you know what? In the scheme of things, what has happened to me and what has happened to my life is so enormous that in some ways I just have to sit back and say, I don't know, what is she feeling? What makes her lash out like this?

And I think the answer is that she`s a scared human being. She`s hurt. And this is her way of dealing with it, because, Nancy, if I can`t find compassion for her, then I`ll just be turning what`s going on into a way to make myself angry and hateful. And that`s wrong. I just know deep down know that I can`t respond that way.

GRACE: Daniel, you`re certainly a better person than me. I have always given you that much, from day one.

But Daniel, not only is she throwing you off the case – that`s one thing -- you`re number four in a long line of fine trial lawyers she`s thrown off a case. But to accuse you of murdering Pamela?

HOROWITZ: It`s a very harsh statement. She doesn`t...

GRACE: Harsh?

HOROWITZ: She hasn`t even spoken to me about Pamela. So I can only take it in the context that she made it in. She`s saying this from her own institutional cell looking at the bars or looking at the doors, frightened about what`s going to happen to her. And I just have to say...

GRACE: But Daniel, she says that you made comments to her that suggested you had something to do with Pamela`s death and that Vitale (sic) is going to walk. Excuse me, that her perpetrator is going to walk.

HOROWITZ: I know, but realistically, we all know and I`m just telling you now, I did not talk to Susan Polk or any client about Pamela. I mean, it`s none of her business.

And it does -- I mean, her putting herself into my business or my personal life is not comfortable. But as defense attorneys, Nancy, you know this, this happens to us a lot. But it doesn`t usually happen in such a public way.

GRACE: Well, all I remember is this, Daniel, when I was there with you following Pamela`s murder, you kept -- I don`t even know if you remember this or if you can recollect this, but you kept talking about, "What am I going to do about the Polk case? I`ve got to get back to work on the Polk case. What am I going to do? I can`t let her down."

This was right after Pamela`s murder. You and I are had just come out of the house. And you were concerned about your duty as a defense lawyer.

Do you even remember that?

HOROWITZ: Well, what I remember, really, Nancy, is your support. And in my cell phone right here, it comes up, "Our Angel." That`s your name. When you call, that`s what comes up.

I don`t remember the things about duty and keeping my life together. But I do remember talking to my kids, Pamela`s kids, my kids, and deciding I had to finish the Polk case. I had to do it.

GRACE: I remember that.

Right now, a special guest is joining us for the first time. Susan Polk`s mom is speaking out. Her name is Helen Bolling, and she is joining us from San Diego, California.

Ms. Bolling, thank you for being with us.

HELEN BOLLING, SUSAN POLK`S MOTHER: You`re very welcome. Thank you for having me.

GRACE: Are you in touch with Susan Polk, your daughter?

BOLLING: No, the communication is very bad. You know, that`s a long story in itself.

GRACE: Right. I know it`s hard because when she`s incarcerated, the only way to call out – they have very limited time on the phone for personal calls.

BOLLING: Absolutely. And it`s very expensive.

GRACE: Then -- yes, very expensive. It`s a collect call.

BOLLING: Right.

GRACE: It`s very difficult. But especially just getting to the phone if it`s not their lawyer.

BOLLING: Right.

GRACE: And how far away do you live from the jail?

BOLLING: Well, I`m in San Diego, you know.

GRACE: So that`s several hours.

BOLLING: Yes.

GRACE: Question. Do you regret that Susan Polk ever even met her husband, Felix?

BOLLING: Oh, god, it was the biggest mistake I`ve ever -- I mean, you know, she was just a little kid. She was maybe 14 years old.

And she had been referred to Felix Polk as a possible psychologist to assist her. She was recommended by the county psychologist in Contra Costa County, Concord, California.

GRACE: Right.

BOLLING: And we went down, Susan and I, to meet him, and Susan normally did not take to someone so quickly, but she did to Felix. And I was elated.

GRACE: Why did you say it`s the worse thing you ever did?

BOLLING: Oh, well, I mean...

GRACE: I mean, what did you have to do with it?

BOLLING: ... hindsight is 20/20. I took Susan to Felix Polk`s for counseling.

GRACE: Oh, I see. Mrs. Bolling, I`ve got a question for you about these most recent developments. This is, I think, the third or fourth lawyer your daughter has kicked off the case.

BOLLING: Yes.

GRACE: What is wrong with her?

BOLLING: It`s shameful. Oh, darling, you know, it is -- Felix had such control of this young woman. She never had a womanhood, you know. And I understand he would badmouth me about -- to Susan and even the grandchildren.

GRACE: Probably to isolate them away from you and your influence.

BOLLING: That`s right. That`s exactly right.

GRACE: That`s a very common, common thing with controlling spouses.

BOLLING: Exactly right.

GRACE: But I`m concerned today about her publicly stating that my colleague Daniel Horowitz had something to do with the murder of his wife. Remember, at the beginning, everyone was saying that it simply has not been borne out by the facts.

BOLLING: Absolutely.

GRACE: And your daughter, I mean, he tried so hard to help her.

BOLLING: Of course. Well, I`ve done my very best. I`ve counseled all the people that I respect, and all of them have come down and said, look it, as intelligent as she is and as smart as she is, it`s the worse thing for her to go into court without a lawyer. And I`ve tried to convince Susan that sometimes in life we`re given the choice of, you know, that we have to make.

GRACE: Well, have you spoken to her about these accusations she`s made against Daniel?

BOLLING: No, I haven`t had a real heavy-duty chance to talk to her, but I know I met Dan Horowitz, and I know him. And he is one of the most compassionate human beings I`ve ever met in my whole life.

GRACE: Then why would your daughter do this to him? Not just throw him off the case, that`s one thing.

BOLLING: OK. Well, Nancy...

GRACE: But then to claim he murdered his own wife?

BOLLING: Yes. Yes. Nancy -- this is Nancy Grace, right? Is this right?

GRACE: Yes.

BOLLING: None of us have gone through the experience that Susan has to be able to respond -- I mean, certainly, we know -- you and I know that it`s not right or possible that Dan was involved in the case of his wife. I mean, I met Ms. Vitale, which was really not too long before she -- this terrible thing happened to her.

(BEGIN VIDEO CLIP)

POLK: And I hope that people will not be prejudiced by the charge that`s been brought and that they will listen with an open mind to what I have to say.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

HOROWITZ: She has a defense, because if she exploded in the rage of a woman who had been held almost in a cult, the cult of Felix Polk for all of those years, having her youth robbed, then that anger exploded in killing her with all of those stab wounds, which is a sign of anger, is justifiable and understandable.

You have a woman who was essentially raped at age 15, 16, 17, 18 by her own psychiatrist because he used his position of trust and power. Instead of helping her, he used it to form a relationship.

(END VIDEO CLIP)

GRACE: And there you see the beginnings of Daniel Horowitz` defense for Susan Polk. Susan Polk facing trial now for well over two years after the murder of her husband. Nearly 30 stab wounds.

Let me see here. I pulled out of my pocket Constitution, Jim Moret, I see Amendment Six, yes, you`ve got the right to a lawyer, but it doesn`t say you have the right to four lawyers. And it doesn`t say you have the right to when it gets trial time you fire the lawyer every time so there`s another delay.

MORET: Well, you`re right. And I`ll tell you what is really distasteful about this. Daniel Horowitz and his partner, Ivan Golde, took me on a tour of the Polk home and gave me their view of what happened, that Susan Polk killed her husband in self-defense.

And you know what? This is not a money-making trial for either Dan or Ivan. They took this case because they believe that woman. That believe that Susan Polk was innocent. That`s why they were doing this.

And to hear these new allegations from Susan Polk makes it all the more distasteful, especially when you know the circumstances around Dan`s case.

GRACE: Daniel Horowitz, I thought the first rule of honor amongst the defense bar is to get your money up front. Are you telling me this woman didn`t even pay you?

HOROWITZ: Well, Nancy, we took this case as a court-appointed case, which is about a quarter...

GRACE: OK. That`s enough.

HOROWITZ: And then we`re splitting the money, too, between me and Ivan Golde.

GRACE: So you and Golde are splitting what, a couple hundred bucks?

HOROWITZ: We`re splitting...

GRACE: That might cover your gas.

HOROWITZ: We felt strongly that Susan had a very tough background, we liked Helen Bolling, and we wanted to help the best we could.

GRACE: OK. I`ve got a question for you, Daniel. Do you feel betrayed?

HOROWITZ: Nancy, I start to feel betrayed, and then each time I go back to remembering what Susan has been through and what it must feel like to be on trial. Now, if you look at that Christmas card that she gave me - - and she gave me a Christmas card this year, hand done, beautiful, artistic -- it showed something remarkable about her. Just six days later, this is what happened.

GRACE: It shows a split personality, a possible insanity or mental incompetence defense is what she`s trying to mount now?

HOROWITZ: I don't think so, Nancy. I think it -- I don't know what it says.

I'm just putting that out there, that every time I feel hurt or defensive or bad about, you know, was I not, like, good enough to her or kind enough to her so she lashed out like this, I just say, well, look at it from her point of view. Look at that beautiful card she made me. There is a good part to her.

And I keep going back because that's what I need to find inside myself to make something good out of what's happening here.

GRACE: Ray Giudice, criminal defense attorney out of the Atlanta jurisdiction, what do you do when you have a client that not only fires you off the case after tons of work, but then accuses you of criminal conduct of the worst kind?

RAY GIUDICE, DEFENSE ATTORNEY: And Nancy, you're seeing the model. I greatly admire Mr. Horowitz's dignity and professionalism under these circumstances. It's a privilege to be in the same profession as he is.

And this is a model. There's nothing else you can do but do what he's doing. You suck it up. You get fired in this business, they file (INAUDIBLE) and argue ineffective assistance of counsel, and that's just part of the business.

GRACE: Well, you know what, guys? I admire you this for this one thing, but as stoically as Horowitz is taking it, being accused by his own client of his wife's murder, publicly, I remember this -- Elizabeth.

(BEGIN VIDEO CLIP)

HOROWITZ: You scream, you cry, but I know I just basically sat with her and I just told her, "I love you and you're beautiful." And, you know, just whatever things you say to somebody you love, because to me, at that point, all that was there was the person I love.

I mean, it didn't matter any more, you know, what -- what was around her or the horror. I had just so much time with Pamela. So, I just looked at her face, and it was beautiful.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

POLK: I was asked by the court on December 2 whether I could proceed with Dan as my attorney, and he was also asked if he could proceed and whether there was any conflict of interest. And I said that I wasn't aware of any on my part at that time, and since then I've changed my mind about that.

There have been certain things that have come to my attention that I was not aware of at the time. And I could see how certain statements that Dan has made to me could potentially be used in the defense of Mr. Dyleski, who is charged with the murder of Dan's wife.

(END VIDEO CLIP)

GRACE: If that's not bucking for an insanity defense, I don't know what is. That's Susan Polk. She just fired Daniel Horowitz off her case. He was working for practically nothing.

Before we take you across the country to Virginia and the breaking news in the Taylor Behl case, a few more moments with Daniel Horowitz.

So Daniel, at this juncture, will she be able to represent herself? You know, that worked really well for Colin Ferguson. Remember him, the Long Island railroad shooter?

HOROWITZ: I remember that, Nancy.

GRACE: Yes, he's doing hard time now.

HOROWITZ: You know I think she's going to get to defend herself. Judge Brady has a lot of discretion either way. So I can't really predict, but I've heard a lot of people like your friend Jimmy Anderson say that she's going to grant it.

GRACE: OK. So we could see Susan Polk defending herself.

Very quickly to Susan Polk's mom, joining us, Helen Bolling. She's joining us from San Diego.

I know you want what is best for your daughter. I know this is not the first crazy idea she's had. Didn't she make you undergo a test to prove you're truly her biological mother?

BOLLING: Well, I was asked by Susan, but it wasn't Susan's idea. See, you guys have got it all screwed up.

GRACE: OK. What happened? I'm sorry. I was told that she wanted you to take a scientific test.

BOLLING: It was Felix who was behind all that kind of garbage.

GRACE: What happened?

BOLLING: Susan expressed the thought that she suspected that perhaps I was not her mother, that there had been an error at the hospital. And given that there had been some recent newspaper reports in other cases where there had been an error in giving the wrong child to somebody, I agreed to have myself tested.

GRACE: Right. And you were tested?

BOLLING: Yes.

GRACE: And you are her mother?

BOLLING: Oh, well, yes, absolutely.

GRACE: Of course you are.

BOLLING: In fact, the margin of error was so almost invisible because...

(CROSSTALK)

GRACE: Hey, Daniel, before we go to break...

BOLLING: Just a minute.

GRACE: ... welcome back, friend.

HOROWITZ: Thank you, Nancy. Thank you.

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

MATT BEHL, TAYLOR BEHL'S FATHER: His name is Ben Fawley, and he is, as you say, a 38-year-old photographer in Richmond.

GRACE: And what do we know about him? What was their relationship?

BEHL: Actually, he was the roommate of a VCU student that Taylor went down to -- when she went down to visit that school in February, he was the roommate of a boy that went to school there at VCU.

JANET PELASARA, TAYLOR'S MOTHER: I am positive the authorities will bring the sub-humans to justice, and I pray they receive the death penalty.

(END VIDEO CLIP)

GRACE: Tonight, breaking news out of Virginia. An indictment in the case of Taylor Behl. We all stood by anxiously waiting for a resolution, hoping that Taylor Behl, just 17 years old at the time she went missing, just weeks into her freshman year at VCU, hoping she would be found. Her remains were found. And today, months later, finally, an indictment.

Straight out to a reporter with "Justice" magazine, Alex Koppelman. Bring us up-to-date, Alex.

ALEX KOPPELMAN, "JUSTICE MAGAZINE" CONTRIBUTOR: Nancy, it took just 45 minutes for the grand jury to come back with an indictment against Fawley today. He's been in jail since September, since police searched his apartment and allegedly found evidence of child pornography on some of his computers.

And in October, shortly after her body was found, the "Richmond Times- Dispatch" reported that he went to police and told them that he was when she died, that the two had been having sex and that her death was an accident, and he panicked and hid her body in a shallow grave in rural Virginia where it was found.

GRACE: Her death was an accident?

KOPPELMAN: That's what he's saying, yes.

**MSNBC.com**



# Murder in the midst of a murder trial

Unfortunate coincidences in the death of California attorney's wife
By Keith Morrison
Correspondent
updated 5:02 p.m. PT, Sun., Oct. 23, 2005
Scott Dyleski, the local teenager who was arrested in connection with this case, will be tried in July 2006.

SAN FRANCISCO, Ca. - It happened up in the gentrified hill country just east of San Francisco bay, a crime that played out like pulp fiction... but true. Too true.

East bay defense attorney Daniel Horowitz had discovered, mid-career, a whole new calling — as legal commentator on shows like MSNBC's "The Abrams Report," and Court TV's "Nancy Grace's Closing Arguments." He still practiced, of course, defending everything from murder cases to marijuana possession.

Horowitz had been married to Pamela Vitale for more than a decade. Lately she had been working in her husband's firm.

"Not only were they husband and wife, but they seemed to be friends. And I thought that was pretty cool," says Barry Morris, a fellow criminal defense attorney, who had met the couple on a few occasions.

And brick by brick, up on their own hilltop compound, Dan and Pamela were building a huge dream villa, living meanwhile in the trailer beside it.

"Pamela wanted that home. She did the design, the construction, it was what she wanted," recounts Ivan Golde, who works side by side with Horowitz. "Dan went along with it. He wouldn't live in a home like that."

And though it was a multi-million dollar property, Horowitz worried about neighbors— one in particular, who, he claimed, might be a threat to his wife.

"In fact, there was a restraining order written where Dan Horowitz specifically mentioned that 'my wife is in danger,'" says Golde. That order was never issued— the two neighbors apparently worked out their differences.

But was Pamela safe, up on their isolated hilltop?

## A murder during a murder trial
And then Dan Horowitz managed to land one of the biggest cases around, representing Susan Polk, a woman who freely admits she killed her own spouse.

Just two weeks ago, as the trial began, Pamela sat in the courtroom and listened to her husband tell the jury Susan Polk killed her spouse in self defense. Pamela, of course had no idea what was waiting for her just days away.

"We were doing well in trial," claims Golde. "We were winning this case."

Then, Friday night, nine days ago, Horowitz appeared on "Dateline" to argue his case for Susan Polk.

That night, apparently on top of the world, he called his media friends.

The next day, he spent in meetings with his staff.

"He called Pamela several times," recounts Golde. "She didn't answer the phone. He thought that was odd. But, we were meeting, we were busy. So, I saw Dan until 2:30. And he seemed absolutely fine."

When he arrived home about dinner time, Horowitz said later, he was surprised to see Pamela's car outside. Said he thought she was at the ballet.

Here is how he explained what he found to MSNBC's Dan Abrams.

**Dan Horowitz:** I just went to the door and saw a smear on it which i knew was bad, and then I found her there, and... **Dan Abrams, TV host:** You touched her body and felt her pulse and spoke some words to her. **Horowitz:** When she was lying there, even though I knew that she was dead, I touched her on the temple to see if she was alive, and called 911 on the phone and then went back to her. I just told her, I said a million things, I screamed, I cried, I told her I loved her...

Pamela Vitale was dead, apparently beaten to death, in her own house.

But who would want to kill her?

"Pamela is just the sweetest, nicest, most selfless woman you ever want to know," says Golde.

The early clues? There was no sexual assault, no robbery, none of the usual signs of assault by a walk-in stranger.

"This beating implies something much more personal," Golde adds.

**Who did it?**
Right away, attention went to the high profile Polk case. Was there a connection?

"I don't know of anybody involved in the Polk case who has a motive to do this," says Morris. "I mean, it's just bizarre."

But Morris who intended to oppose Horowitz's argument in the Polk case, was called in for questioning.

"When in doubt, ask all about. That's fine. I mean, they asked me a whole bunch of questions. But they stopped taking notes pretty early on in the interview," says Morris.

Perhaps because of a theory which soon spread around town: Could it have been the neighbor, the man against whom Horowitz had tried to obtain a restraining order, the man he said had threatened his wife? But when the neighbor was questioned, there was no arrest.

Media, satellite trucks, began to assemble at the base of the Horowitz hill, and a new suspicion fueled the gossip around northern California. "Well, it didn't surprise me in the sense that whenever there's a husband and wife situation where one spouse is dead, the first person to talk to is the spouse," explains Morris.

Then, questions: Was there trouble in the marriage? Had the hugely expensive construction project come between them?

It appeared Pamela had answered the door to her killer wearing underwear. Was the killer someone she knew very well?

Dan Horowitz prepared for a funeral, and found himself dealing with questions from the very media he worked with.

**Abrams:** People have asked whether you have taken a polygraph, have been asked to take a polygraph. Would take a polygraph? **Horowitz:** I have not been asked to take a polygraph, I would take a polygraph at any time that the police asked me to do it, but beyond that Dan, I would do anything the police asked me to do.

Would they ask? There was a nervous, expectant wait. And then, the very morning of Pamela's funeral, the sheriff called a press conference. The announcement came right out of left field.

**Local boy arrested**

A local 16-year-old boy was arrested in connection to Pamela Vitale's murder. He lived just down the road from the Horowitz hill.

A student at a nearby junior college, he wasn't a bad kid, at least according to a former classmate. But he'd changed lately, said others. He became interested in gothic things.

But, commit murder? Why?

The answer, reports Demian Bulwa of the San Fransisco Chronicle, is perhaps even more bizarre than the rest of the awful business: "He and a friend had allegedly been in a scheme where they were going to grow marijuana, I assume indoors, hydraponically," says Bulwa.

The boy, his sources had told him, wanted equipment to grow marijuana.

"A few days before the killing of Pamela Vitale, this boy allegedly ordered the equipment using some stolen credit card numbers from another neighbor of his. And he believed that this stuff may have ended up at Pamela Vitale and Daniel Horowitz's home. And so on Saturday, the day of the killing, he went up there in an effort to retrieve these goods. And he got into this confrontation with Pamela Vitale that ended so tragically," says Bulwa.

Pamela struggled hard, according to Horowitz. The chronicle's Bulwa reported the attacker struck her on the head: 39 blows with a piece of crown molding. Then he scratched a gothic symbol on her back. And took a shower in her bathroom, drank a glass of water and left.

Murder in the midst of a murder trial. A chain of tragic coincidences.

Which led, finally, here: Scott Edgar Dyleski, 16 years old, appeared in adult court on a charge of murder with "enhancement," or use of a deadly weapon.

He was a young man whose family Dan Horowitz knew— he had given them free legal advice, as he built his practice and his profile, and she their house on the hill— the one they'd planned to live in for the rest of their lives.

"It's ironic that the house was for Pamela and Pamela was the victim," says Golde. "And now neither of them will live in that house. It's very very sad."

© 2007 MSNBC Interactive

URL: http://www.msnbc.msn.com/id/9796806/

# Daniel Horowitz



From Wikipedia, the free encyclopedia

## Contents

- 1 Background
- 2 Marriage
- 3 Wife's murder
- 4 References
- 5 External links

## Background



**Daniel Horowitz**

| | |
|---|---|
| **Born** | December 14, 1954 New York City, New York |

Daniel Horowitz was born in New York City. He received his Bachelor of Arts from Hampshire College. In 1980, he earned his Juris Doctor (J.D.) from Southwestern University School of Law in Los Angeles, California. He was admitted to the California State Bar that same year.

Because of his successful legal practice, he was a frequent TV commentator during the Scott Peterson trial. He has appeared as a regular legal commentator on CNN, MSNBC and Fox News.

## Marriage

Horowitz said he and Pamela Vitale met earlier than 1993 when Vitale worked in Hollywood as an independent movie producer after attending film school at the University of California Los Angeles. He had written a screenplay about one of his cases and was shopping it around. Mutual friends brought the two together. According to Horowitz, "she was interested in reading my script," he remembered. "But once I met her I fell completely in love and no longer cared about the script." [1]

Vitale was a single mom raising a 15-year-old daughter and an 18-year-old son. The two began dating long distance. They were married in 1994 on a rainy day in November. [2] Vitale moved to the Bay Area with her daughter, Marisa, and took a job working for Pacific Bell. She eventually became an executive at Informix. When the company was sold, Vitale took her severance pay and began working in Horowitz's law firm maintaining databases.

June 2007: Daniel Horowitz married Valerie Northrup, his third wife. Northrup was excused as a juror from the Susan Polk trial in October of 2005.

## Wife's murder

On October 15, 2005 he found his wife dead at the mobile home where the couple was living while their house was being built nearby. At the time, Horowitz was defending Susan Polk in her murder trial.[3] Vitale and Horowitz had been married nearly 11 years and were building their dream home for the past two years in Lafayette in Contra Costa County, California. Medical examiners have concluded that Vitale died from blunt trauma to the head. When contacted via cell phone by a Bay Area newspaper, Horowitz said, "I can't talk, I can't. It's beyond words." [4]

On October 20, 2005 police arrested a 16-year-old boy from Lafayette, California, Scott Dyleski, in connection to the crime.

Dyleski was convicted of killing Pamela Vitale on August 28, 2006. He was sentenced to life imprisonment without the possibility of parole on 26 September 2006. [5]

# References

1. ^ "I just wanted to grow old with her" Famed lawyer talks of his wife, who was killed at site of their dream home (http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2005/10/17/MNGOTF9M4D15.DTL) - San Francisco Chronicle, 10/17/05
2. ^ Vitale missed by MB friends (http://easyreader.hermosawave.net/news2002/storypage.asp?StoryID=20027541&IssuePath=news2005/1020/) - Manhattan Beach News, 2005
3. ^ Court TV host Catherine Crier (February 20, 2007). Final Analysis: The Untold Story of the Susan Polk Murder Trial. ISBN 006113452X.
4. ^ Wife of attorney found dead: Homicide feared (http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2005/10/16/BAGORF976R1.DTL) - San Francisco Chronicle, 10/16/05
5. ^ Teen Gets Life Without Parole for Vitale Slaying (http://www.msnbc.com/id/15017291/) - MSNBC.com, 9.26.2006

# External links

- Official Website (http://www.whitecollar.us/index.html)
- FindLaw Profile (http://pview.findlaw.com/view/2954662_1)

Retrieved from "http://en.wikipedia.org/wiki/Daniel_Horowitz"
Categories: 1954 births | Living people | California lawyers | Hampshire College alumni | People from New York City | American Jews
Hidden categories: Wikipedia introduction cleanup | All pages needing cleanup

- This page was last modified on 7 March 2008, at 06:12.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.

E, Aa

SUMMARY OF EXPENSES PAID BY COUNTY

Horowitz' Team - never used by Susan Polk's experts
never testified or produced reports

| | | | |
|---|---|---|---|
| x | 1. Dr. Douglas Tucker, psychiatrist | | $31,612.50 |
| x | 2. Monte Beers' Investigative Scs. | | 7,960.00 |
| x | 3. Dr. Martin Williams | Psychologist | 8,591.58 |
| x | 4. Dr. Paul Hermann | Pathologist | 787.50 |
| x | 5. Joanne Schulman | Family Law Spec. | 825.00 |
| x | 6. Horowitz, Dan (not desired) | | 60,908.00 |
| v | 7. Golde, Ivan (never requested) | | 43,280.00 |
| | Total | | $152,352.98 |

x  Total undesired Services:                    ($152,352.98)
    Experts Retained by Susan Polk, had been retained
         by Horowitz; no reports produced, both testified

| | | |
|---|---|---|
| 1. Dr. Linda Barnard | Domestic Violence | 12,420.00 |
| 2. David Townsend - LEOR | Comp. Exp. | 17,737.12 |
| | | $30,157.12 |

Retained for Susan Polk 2006 Trial exclusively
    Experts both testified; no reports as such;
    Cooper - letter
1. Dr. John Cooper    Pathologist    $4,800

Ex Bb

**CONTRA COSTA COUNTY**
**COSTS FOR THE SUSAN POLK TRIAL**
**FY 2005/06 AND 2006/07**

| Org | Sub Obj | Description | TC Reference | Date Posted | Amount | Option | Vendor Number | Vendor Name | Service Description |
|---|---|---|---|---|---|---|---|---|---|
| **PROFESSIONAL / SPECIALIZED SERVICES** | | | | | | | | | |
| 2123 | 2313 | POLK 031668-7 | 52 G-335677 | 4/11/2006 | $814.00 | MIS | 13838 | Debra Mack Eastridge | Reporting/Transcription |
| 2122 | 2310 | POLK | 52 G-351513 | 5/25/2006 | $4,300.00 | MIS | 11515 | Daniel Schumaker | |
| 2122 | 2310 | POLK PRO-FEV | 52 G-356559 | 8/9/2006 | $5,920.00 | MIS | 05373 | Carson Atty Service | Process services |
| | | | | Subtotal: | $11,034.00 | | | | |
| **COURT APPOINTED COUNSEL / LEGAL SERVICES** | | | | | | | | | |
| 2123 | 2313 | POLK 031668-7 | 52 G-280680 | 8/17/2005 | $1,830.00 | CRM | 16981 | Stuart W. Willis, Atty | Legal services |
| 2122 | 2313 | POLK | 52 G-287720 | 12/13/2005 | $51,025.80 | CRM | 04640 | Daniel Horowitz | Legal services |
| 2122 | 2313 | POLK | 52 G-292283 | 12/21/2005 | $630.00 | CRM | 00001 | Ivan W. Golde | Legal services |
| 2123 | 2313 | POLK 031668-7 | 52 G-309484 | 1/25/2006 | $2,960.00 | CRM | 00081 | Lawrence Kaplan | Legal services |
| 2122 | 2313 | POLK | 52 G-332845 | 3/31/2006 | $33,460.00 | CRM | 04640 | Daniel Horowitz | Legal services |
| 2122 | 2313 | POLK | 52 G-332517 | 3/31/2006 | $8,883.10 | CRM | 04640 | Daniel Horowitz | Legal services |
| 2122 | 2313 | POLK | 52 G-356858 | 8/9/2006 | $8,900.00 | CRM | 04132 | Ivan W. Golde | Legal services |
| 2122 | 2313 | POLK | 52 G-374810 | 7/28/2006 | $1,500.00 | CRM | 07745 | David J Briggs | Legal services |
| 2123 | 2313 | POLK 060702-8 | 52 G-468666 | 5/16/2007 | $2,703.50 | APP | 10428 | Alexander Astarlin | Legal services |
| | | | | Subtotal: | $113,402.90 | | | | |
| **WITNESS / OTHER SERVICES** | | | | | | | | | |
| 2124 | 2352 | POLK | 52 G-282856 | 8/23/2005 | $1,180.00 | INV | 08112 | On Time | Legal process service |
| 2124 | 2352 | POLK | 52 G-284480 | 8/26/2005 | $1,340.00 | INV | 08112 | On Time | Legal process service |
| 2122 | 2352 | POLK | 52 G-298688 | 12/13/2005 | $12,487.50 | MD | 02008 | Douglas Tucker, M.D. | |
| 2122 | 2352 | POLK | 49 G-287980 | 1/9/2006 | $3,906.28 | INV | 07818 | Monte Beers Investigative Services | |
| 2122 | 2352 | POLK | 49 G-287980 | 1/9/2006 | $4,685.30 | INV | 07818 | Monte Beers Investigative Services | |
| 2122 | 2352 | POLK | 52 G-307474 | 1/18/2006 | $5,335.00 | MD | 00857 | Martin H. Williams, Phd. | |
| 2122 | 2352 | POLK | 52 G-313028 | 2/8/2006 | $787.50 | MD | 07886 | Paul W. Hermann, M.D. | |
| 2122 | 2352 | POLK | 52 G-318844 | 2/17/2006 | $2,902.79 | MD | 07886 | EFOR, Inc. | |
| 2122 | 2352 | POLK | 52 G-318843 | 2/17/2006 | $8,760.00 | MD | 07885 | Linda Barnard, Phd. | |
| 2122 | 2352 | POLK | 52 G-318844 | 2/17/2006 | $7,030.00 | MD | 07886 | EFOR, Inc. | |
| 2122 | 2352 | POLK | 52 G-321128 | 2/24/2006 | $825.00 | MD | 07929 | Joanne Schulman, Law Offices of | |
| 2122 | 2352 | POLK | 52 G-331784 | 3/28/2006 | $605.00 | MD | 07886 | EFOR, Inc. | |
| 2122 | 2352 | POLK | 52 G-332644 | 3/31/2006 | $2,800.00 | MD | 08129 | John T. Cooper, Jr. | |
| 2122 | 2352 | POLK | 52 G-332648 | 3/31/2006 | $1,100.00 | MD | 08135 | Ted L. Gunderson | |
| 2122 | 2352 | POLK | 52 G-350318 | 5/23/2006 | $3,860.00 | MD | 07885 | Linda Barnard, Phd. | |
| 2122 | 2352 | POLK | 52 G-351484 | 5/25/2006 | $3,000.00 | MD | 08816 | Karen Fleming-Ginn, Phd/Jury Verdix Consulting, Inc. | |
| 2122 | 2352 | POLK | 52 G-353443 | 8/1/2006 | $4,444.40 | MD | 07886 | EFOR, Inc. | |
| 2122 | 2352 | POLK | 52 G-362887 | 6/23/2006 | $2,625.00 | MD | 00857 | Martin H. Williams, Phd. | |
| 2122 | 2352 | POLK | 52 G-364206 | 6/29/2006 | $2,000.00 | MD | 08129 | John T. Cooper, Jr. | |
| 2122 | 2352 | POLK | 52 G-370515 | 7/19/2006 | $3,526.64 | MD | 08826 | Alan Peters | |
| 2122 | 2352 | POLK | 52 G-388116 | 8/12/2006 | $2,755.00 | MD | 07886 | EFOR, Inc. | |
| 2122 | 2352 | POLK | 52 G-383525 | 9/26/2006 | $19,125.00 | MD | 02008 | Douglas Tucker, M.D. | |
| 2122 | 2352 | POLK | 52 G-401151 | 10/20/2006 | $742.50 | INV | 08135 | Ted L. Gunderson | |
| 2122 | 2352 | POLK | 52 G-401151 | 10/20/2006 | $357.50 | INV | 08135 | Ted L. Gunderson | |
| 2122 | 2352 | POLK | 52 G-418587 | 12/18/2006 | $797.50 | INV | 08135 | Ted L. Gunderson | |
| 2122 | 2352 | POLK | 52 G-418587 | 12/18/2006 | $33.00 | INV | 08135 | Ted L. Gunderson | |
| 2122 | 2352 | POLK | 52 G-418587 | 12/18/2006 | $28.00 | INV | 08135 | Ted L. Gunderson | |
| | | | | Subtotal: | $97,639.91 | | | | |

**Grand Total: $222,076.81**

Bail Hg. 7/23/01

28

1   aspects, I don't believe she is.

2          Q.    You're aware that she's been in custody for

3   most of the last two years?

4          A.    That's correct.

5          Q.    Are you aware that she has the ability to

6   write letters and use the telephone from the jail?

7          A.    Well, I assume she does.

8          Q.    And during that time, you've received no

9   threatening communications of any type from her?

10         A.    No, that's correct.

11         Q.    When you described your concerns to the

12  probation officer preparing a bail study in this case, did

13  you identify to that person your relationship with

14  Doctor Polk as far as him treating your family and giving you

15  professional advice?

16         A.    Well, that assumes a fact not in evidence,

17  number one.

18                And number two, I remember telling the person

19  that did the bail study, basically, the short version of the

20  relationship.  I don't remember getting into any great

21  detail.  I'm sure I must have told her how I knew Susan.  I'm

22  sure she would have asked and I told.

23         Q.    Did you characterize yourself as a family

24  friend?

25         A.    I think that was an accurate characterization.

26  Yes, I did.

27         Q.    Do you consider yourself to be a friend of

28  Susan's?

Dd



# CONTRA COSTA COUNTY
# DETENTION FACILITY

(✓) INMATE REQUEST FOR INFORMATION     ( ) MEDICAL REQUEST

To: _Law Library_

From: _Susan Rile_                    Bkg # _AJ368277_

Date: _11/3_ / _07_   (DOB) Housing Assignment: _CCDF 4-74_

Check One:    (✓) Request   ( ) Grievance   ( ) Appeal   ( ) Other

Request: _1) Rules of Decisions - 1938 Amer. Cal. Fed. Code_
_§1688   _, _2) Damages Stipulation, eff. of_
_Rescission  3) effect of Rescission, b/wn S.C.,_
_Effect of Rescission - Position of Parties 7 & 8_
_Title 15 Bankruptcy 8_
_2) Rescission, Compl. CCP 337 thru 9_
_joint control_
_3) unlawful Civ. Code 1690, 3399 _ thru_ 1600 thru 1789_
_4) Commercial Code 2201 - et - stipulations_
_2209   2701 - 4500, 2703,_
_5) 5th ACR 13 - Parol - Evid. Rule. D.g. I _
_every Fraud Too Much_

Date Rec'd: _11 / 3 / 07_   Rec'd By: _IMING_

Routed To: _____

ANSWER:        ( ) APPROVED        ( ) DENIED-(state reason)
_2) 1) 2) - no Civil_

By: _____     Date: _11 5 07_

Pink: Kept by Inmate        Yellow: Reply to Inmate        White: To Booking
DET 024: FRM 1/2/91

Susan Polk (x23159)
CCWF 504-236
P.O. Box 1508
Chowchilla, Ca 93610-1508

(5/8/08 SP)

LEGAL & CONFIDENTIAL

RECEIVED

MAY 13 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102